cient to justify it in commuting the annuities.

■ If this view is correct, and we think it is, then it is unnecessary for us to discuss appellants' assertion that the living members of the tribe had no right to cut off future members of the tribe from the benefit of these annuities. The annuities were tribal funds, both parties agree, as of course they must, and Congress has plenary authority over such funds. Whether or not the living individual Indians had the right to cut off future members of the tribe, Congress certainly had the power to do so.

■ It does not follow from what we have said, that the Indian Claims Commission is without authority to treat the agreement as a nullity, if it was obtained by fraud. Congress, by the passage of the Act ratifying the agreement, cannot be said to have ratified the perpetration of a fraud. Section 2(3) of the Indian Claims Commission Act, 60 Stat. 1049, 25 U.S.C.A. § 70a, gives the Commission jurisdiction to hear and determine "claims which would result if the treaties, contracts, and agreements between the claimant and the United States were revised on the ground of fraud, * * * mutual or unilateral mistake, whether of law or fact, or any other ground cognizable by a court of equity; * * *." However, the Commission found that there had been no misrepresentation and that fraud had not been practiced in any other way. After a review of the record we think there was substantial evidence to support this finding. Prior to the agreement each member of the tribe had received from the Government $11.00 each year. In 1914 there was paid to each of the enrolled members the sum of $236.59, and thereafter no further annuities were paid, with the exception of disbursements from accrued interest in 1915 and 1917. No protest whatever was made against this for more than twenty years. This lack of any protest is a clear indication that no fraud had been practiced. We are convinced that neither the chiefs nor the members of the tribe thought that the tribe had been defrauded. No mistake or duress is claimed.

We think the conclusion of the Indian Claims Commission was correct, and it is affirmed.

JONES, Chief Judge, and HOWELL, MADDEN and LITTLETON, Judges, concur.

**GREYHOUND CORP. v. UNITED STATES.**

No. 49555.

United States Court of Claims.

April 7, 1953.

260

Edmund M. Brady, Detroit, Mich., Matheson, Dixon & Brady, Detroit, Mich., on the brief, for plaintiff.

Harry H. Davidson, White Plains, N. Y., Holmes Baldridge, Asst. Atty. Gen., for defendant.

Before JONES, Chief Judge, and LITTLETON, WHITAKER, MADDEN and HOWELL, Judges.

LITTLETON, Judge.

The plaintiff seeks to recover $19,411.59 representing the difference between the amount claimed by it for certain transportation services furnished the defendant by the plaintiff's successor in interest, the Great Lakes Greyhound Lines, Inc.,[1] and the amount paid by the defendant for those services.

Between March 1, 1943, and October 31, 1946, the plaintiff transported, in chartered buses, selectees of the U. S. Armed Services within the State of Michigan, between the offices of the local draft boards and the induction or examining centers. Prior to and at the time the round trip charter services in question were furnished, the plaintiff was a party to a general agreement, known as Selectee Passenger Agreement No. 1, hereinafter referred to as Selectee Passenger Agreement, executed by the National Bus Traffic Association, Inc., agent for the plaintiff, and the Director of Selective Service. The purpose of this agreement was to aid in establishing and maintaining a close cooperation between the passenger motor carriers and the Selective Service System in order to provide a workable arrangement in meeting the transportation needs of the local draft boards throughout the Nation. This agreement became effective on September 15, 1941, and remained in force throughout the entire period covered by this suit. Section IV of this agreement provided the method for establishing the transportation charges in question and read as follows:

"Tenders, Fares, Rates and Charges and Conditions in Connection Therewith.

"For traffic covered by this Agreement and subject to conditions herein stipulated the carriers parties hereto through the National Bus Traffic Association, Inc. tender to the Selective Service System the following basis for rates, fares, and charges: * * *

"(2) For intrastate rates, fares, or charges between points within States where the State Commissions do not have jurisdiction over passenger motor carriers' rates, fares, or charges, ninety-five percent (95%) of the rates, fares, or charges, including charter rates, made available to commercial traffic."

The above quoted provisions are applicable here since the services rendered where wholly intrastate in character, and the Michigan Public Service Commission did not have jurisdiction over the regulation of rates for charter service. Thus, the Commission did not require that tariffs covering intrastate charter rates be filed with it.

Each instance of service performed under the Selectee Passenger Agreement was covered by a separate written agreement. In the instant case the parties have presented for our consideration the facts concerning only two of such separate agreements covering two items of service. The issues involved in these two instances are common to all services performed under the Selectee Passenger Agreement during the period in question. The parties have agreed that a decision here will be binding with respect to the additional agreements for services which were furnished during the period covered by this suit. In the first of these,

[1.] Hereinafter the term "plaintiff" will be used to designate both the plaintiff and Great Lakes Greyhound Lines, Inc.

the plaintiff on June 2, 1944, operated a chartered coach service for Selective Service of Michigan between Port Huron and Detroit, Michigan, which involved the use of two buses. The charges were at the rate of 120 live miles [2] at 35 cents per bus mile and 120 deadhead miles [3] at the rate of 30 cents per bus mile, making a total charge of $120. The deadhead mileage was applied to only one of the buses. After applying the five percent discount allowed by the Selectee Passenger Agreement, the total net charge for the transportation service was $114. In the second, the plaintiff on June 6, 1944, operated a chartered coach service for Selective Service of Michigan between Bay City and Detroit, Michigan. It covered the use of five buses, and the charges therefor consisted of 210 live miles at the rate of 35 cents per bus mile and 210 deadhead miles at the rate of 30 cents per bus mile, making a total charge of $619.50. Here the deadhead mileage was applied to four of the five buses used. Upon application of the five percent discount provided for by the Selectee Passenger Agreement, the total net charge was $588.52.

The plaintiff arrived at its charges of 35 cents per bus mile for the live miles and 30 cents per bus mile for the deadhead miles by substracting 5 cents per bus mile on each from the rates which it had made available to commercial intrastate traffic, as of June 1, 1942. It was necessary to resort to commercial rates as of that date in order to apply Section IV (2) of the Selectee Passenger Agreement because on that date an order of the Office of Defense Transportation (see finding 3) became effective which prohibited the furnishing of charter service by bus to the general public, and restricted its use to specified types of military transportation needs which included the transporting of draftees.

The rates in all the individual contracts for services, which are here in suit, were calculated by the plaintiff for each separate charter service on the same basis as were the ones set out above. These rates were agreed to by the Selective Service officials in Michigan, and the plaintiff was paid in accordance therewith.

The General Accounting Office, in post-audit, ruled that for the service rendered by the plaintiff the charges were to be determined under the Northeastern Charter Coach Tariff No. 285, hereinafter referred to as Tariff 285, to which the plaintiff was a party. Tariff 285 which had become effective June 15, 1942, had been duly filed with the Interstate Commerce Commission. On its title page, the tariff read that it was to govern rules, regulations, and charges for charter service "between points on lines of issuing carriers." Plaintiff, as a party to the tariff, was listed as an "issuing carrier," and Bay City, Port Huron, and Detroit, Michigan are points on the lines of "issuing carriers." The decision of the General Accounting Office that Tariff 285 was appliable to the services in suit resulted in a total overcharge of $19,411.59, which was subsequently recovered by the defendant from amounts otherwise due the plaintiff. It is this amount which the plaintiff seeks to recover.

As applied to our two test situations, the application of Tariff 285 would show an overcharge of $11.40 on the first, and $189.-52 on the second. While the plaintiff was allowed 10 cents more per live bus mile on the first and 5 cents more per live bus mile on the second, the tariff, if applicable, disallowed entirely any charge for the deadhead mileage. This came about because of the provisions of Rule 4(a) and 4(d) of Tariff 285. Rule 4(a) read as follows:

"Where the movement of passengers terminate at the point of origin (round trip movements) the deadhead mileage is the distance traversed by the coach, unoccupied by the passengers, from the nearest point at which equipment is held out to be available as shown under 4(d) herein, to the origin point of the point at which the charter operation begins, and from the point of destination back to the place of storage after the charter movement has been completed.

2. Live miles are those operated by the bus when the chartered party is aboard.

3. Deadhead miles are those operated to get the bus from its place of storage to

the passenger movement and charges will be computed as follows: * * *"

Rule 4(d) listed the plaintiff as holding out equipment to be available at Bay City, Port Huron, and Detroit, Michigan. Selective Service of Michigan was not at any time charged for any deadhead mileage whenever the plaintiff actually had equipment available at the point of origin of a selectee-inductee charter movement.

Rule 2(b) of Tariff 285, to which consideration must be given, states:

"All quotations are subject to carrier being able to supply equipment. The operating head at point from which equipment will originate must be consulted prior to making quotation in order to guarantee equipment. The company reserves the right to reject any and all proposals to parties for Charter on Special Bus Service."

Defendant contends that Tariff 285 is applicable to Michigan intrastate service in general and to the service rendered by plaintiff in particular because (1) the language of Tariff 285 does not restrict its applicability to interstate traffic; (2) plaintiff, by posting Tariff 285 at points on its lines throughout Michigan (as required by I.C.C.Regs.) in effect held out to the public that the tariff was applicable to all charter service, intra as well as interstate. From this, defendant urges that, although the contracts between defendant and plaintiff for the charter service called for higher rates than those provided for in Tariff 285, such contracts are not binding on the United States because the Government officials executing such contracts were without authority to agree to pay rates higher than those tendered to the general public in duly published and authorized tariffs, that is, Tariff 285.

Plaintiff contends that it is entitled to the higher rates provided for in its contracts because (1) that despite the seemingly inclusive language of Tariff 285, Interstate Commerce Commission tariffs have no applicability *per se* to intrastate services; (2) that the posting of Tariff 285 was in compliance with Interstate Commerce Commission Regulations, and (a) was applicable only to interstate transportation and (b), in any event, its posting held out all the conditions contained in the tariff, including the right of the carrier to refuse to furnish service under the tariff if it was shown that equipment was not available at points of origin; (3) that the services in question were all intrastate in character; and (4) that at the points in question, plaintiff did not have equipment available for charter service. Plaintiff further contends that defendant's representatives could validly enter into the contracts in question both because the tariff was not applicable to those contracts, and that if it was applicable to intrastate service, it was not applicable to the instant contracts because plaintiff did not have equipment available at the points of origin and would have refused service in accordance with Rule 2(b) of Tariff 285.

The Office of the State Procurement Officer was established in the Selective Service headquarters in Michigan. The existence of Tariff 285 was known to the officials of that office during the period when the service in question was contracted for, and they applied it when inductees were transported interstate from points in Michigan to Chicago, Illinois. They did not use it in determining the rates of the contracts now in question and by their acts it must be assumed that they believed that the tariff did not apply to intrastate trips. The Office of the State Procurement Officer, in the exercise of its duty in arranging for all transportation matters for the Michigan Selective Service System, gave due consideration to all factors related to the cost of selectee transportation. On the basis of such a study its officials executed these contracts for charter hire. A separate contract identical to those which have been presented as test cases was entered into for each charter movement. The plaintiff furnished certain rates and applied the discount provided for in the general over-all agreement. The officials of Selective Service of Michigan acting through their procurement office became a party to these contracts. The agreements were regular, and their authenticity or the authority of those officials to so contract is not in dispute. The plaintiff was paid in accordance with those contracts.

During the first World War the United States and the Railroad Associations on behalf of their member railroads entered into a general over-all agreement much like the Selectee Passenger Agreement which we have before us. Its purpose was to provide for a uniform and efficient arrangement for the transportation of military personnel and equipment. It provided that fares should be "lawful commercial fares on file with the Interstate Commerce Commission * * * less 5 percent." Acting under this agreement the railroads transported men and equipment, billing the Government in accordance with what they termed to be the applicable tariff rates minus the five percent. In a post-audit it was discovered that the railroads had failed to apply a tariff which they had on file with the Interstate Commerce Commission, and which the auditors believed applicable. This resulted in an alleged overcharge which the Government recovered by deducting amounts from other sums due the railroads. The railroads then brought suits to recover these deducted amounts. Missouri Pacific Railroad Co. v. United States, 56 Ct.Cl. 341, was the first of these cases. In that case the court, in rejecting the position taken by the defendant, stated in 56 Ct.Cl. at page 355:

"Where the Government contracts for transportation at a special rate and the plaintiff had on file a special tariff at a less rate than that agreed upon, and which was known to the Government but which was not applied for, and with the conditions of which the Government had not complied, the Government is bound by its contract, as an individual would be."

This rule became the basis for the decisions in other cases which followed, wherein other railroads found themselves in identical positions as respects the furnishing of service under the Railroad Associations' general contract with the Government. Baltimore & Ohio Railroad Co. v. United States, 60 Ct.Cl. 359, 373; Southern Railway Co. v. United States, 60 Ct.Cl. 402; Houston & Texas Central Railroad Co. v. United States, 64 Ct.Cl. 362. It likewise was decisive of the issue in Southern Pacific Co. v. United States, 62 Ct.Cl. 649, where the rates charged for shipments of armor plate were in question.

Here the Government contracted for special transportation services at special rates, that is, 95 percent of those made available to the general public. The plaintiff did have on file a special tariff at a less rate, Tariff 285, and the Government officials knew of its existence. However, the defendant did not apply for the rates offered under that tariff nor did the defendant comply with any of the conditions required by that tariff. Instead the defendant entered into special contracts which contained specified rates.

The construction of tariffs does not substantially differ in character from that of any other document and all pertinent parts and provisions should be taken into consideration, each being given effect if that can reasonably be done. Burrus Mill & Elevator Co. of Oklahoma v. Chicago, R. I. & P. R. Co., 10 Cir., 131 F.2d 532. The condition contained in Tariff 285, which would have been very important in connection with the negotiations in question, is the condition which states that "all quotations are subject to carrier being able to supply equipment." It provided that the operating head at the point from which equipment was to originate must be consulted prior to the acceptance of a proposal under the tariff. The condition further provided that the carrier reserved the right to reject any and all proposals for charter hire if the equipment was not available. Under this tariff the plaintiff company, as an "issuing carrier," was listed as holding out equipment to be available at the cities which were involved in these two test cases. As a practical matter, however, the plaintiff did not have equipment available at those points. The principal reason for this was because of wartime conditions which placed an extra burden on the bus carriers and at the same time cut off the supply of new buses. Thus, if defendant sought to apply Tariff 285 it could only do so subject to this condition, that is, the carrier being able to supply the equipment. This the plaintiff company could not have done. The plaintiff would have refused to furnish the service under Tariff 285, which under this men-

tioned condition it had the full right to do. To support the defendant's contentions would result in inflicting on the plaintiff a contract which, if it had been afforded the opportunity, it would have rejected. The express terms of the tariff provided for such an opportunity. The plaintiff was not afforded the benefit of that condition because of the action of the defendant in not applying for the application of Tariff 285 at the time the contracts in question were executed.

This court in Bush v. United States, 52 Ct.Cl. 199, held that before the defendant may invoke tariff rates which differ from those contained in the original contract, it must first show that it has in every way met the conditions of the tariff sought to be imposed. In that case an agreement had been entered into between the defendant and plaintiff whereby the plaintiff was to transport officers and men of the Arkansas Organized Militia at rates set out in the agreement. This contract which was executed July 20, 1912, also specified that the listed rates were not subject to further deductions unless it was subsequently found that they were in excess of regular tariff rates, and if so the lower rate would govern. during an audit it was discovered that on May 8, 1912, the plaintiff had established a tariff, the rate of which was lower than that provided in the contract between the parties. Defendant contended that it was entitled to deduct from the claim of the plaintiff the difference between the May 8 tariff rate and the rate agreed upon by the parties in their written agreement. Defendant insisted that this tariff came within the meaning of the phrase "regular tariff rates" contained in their agreement with the plaintiff.

This court held that the defendant was bound by the written agreement with the plaintiff. We stated that the May 8 tariff was a special tariff, and in order to take advantage of it certain conditions had to be complied with. It did not appear that the defendant complied with any of the conditions. The defendant did not apply to the plaintiff for these rates. On the contrary, with full knowledge, or at least charged with knowledge that there were such rates,

the United States chose not to apply for them but to enter into a written contract with the plaintiff whereby other rates were fixed.

It should be noted that the tariff which the Government sought to apply in the Missouri Pacific case, supra, contained a condition identical with the one discussed here, i. e., that a request for service under the tariff must first be referred to the proper official who was to decide whether the necessary equipment was available, and the railroad reserved the right to refuse to furnish service under the tariff if it was shown that equipment was not available. The court stated that there was no such request and no such prearrangement, hence the Government should not be entitled to apply a tariff when it has not complied with a necessary condition of that tariff.

Defendant relies on Missouri Pacific Railroad Co. v. United States, 71 Ct.Cl. 650, 661, as setting forth the principle that "Government officers are without authority to contract for rates higher than those tendered to the public in duly published tariffs." However, in that opinion the court recognized that an exception to this general rule existed wherever the Government secured a special rate under a special contract, citing the Missouri Pacific case, 56 Ct.Cl. 341, as indicative of that exception.

No tariff may be interpreted so as to extend its application beyond the statutory power of the Governmental authority with which it is filed. Southern Pacific Co. v. United States, 272 U.S. 445, 47 S.Ct. 123, 71 L.Ed. 343. By statute, 49 U.S.C.A. § 316 (e), it is expressly provided that the Interstate Commerce Commission is without authority to prescribe rates or fares for intrastate transportation. Thus, the mere filing of Tariff 285 with the Interstate Commerce Commission, and its subsequent posting as required by the Interstate Commerce Commission Regulations, cannot serve to make the tariff applicable to intrastate movements.

Whether or not Tariff 285 might have been applied in establishing intrastate rates for charter service in Michigan during the period in question, we do not decide.

We hold that in so far as the contracts which are before us in this suit are concerned, Tariff 285 is inapplicable, and the rates provided by the contracts in question are valid. Judgment will be entered for the plaintiff in the amount of $19,411.59.

It is so ordered.

JONES, Chief Judge, and HOWELL, MADDEN, and WHITAKER, Judges, concur.

## GARVIN v. UNITED STATES.
### No. 558–52.

United States Court of Claims.
April 7, 1953.

Wilburn Garvin, pro se.

John A. Rees, Washington, D. C., H. Brian Holland, Asst. Atty. Gen., Andrew D. Sharpe, Washington, D. C., on the briefs, for defendant.

Before JONES, Chief Judge, and LITTLETON, WHITAKER, MADDEN and HOWELL, Judges.

JONES, Chief Judge.

This is a claim for refund of income taxes withheld from earnings of plaintiff during the years 1945, 1946 and 1947. Plaintiff filed neither an income tax return nor claim for refund for the periods mentioned above until June 1, 1951, when Treasury Department forms 1040(A) were filed with the Collector of Internal Revenue, Chicago, Illinois. The Collector thereupon advised plaintiff that section 322 (b) (1), 26 U.S.C. precluded any refund. The petition was filed in this court on November 6, 1952 and defendant has moved to dismiss.

The controlling provision of the Internal Revenue Code in the instant case is section 322(b) (2) of Title 26 United States Code.[1] This section prohibits the payment of any refund in excess of the portion of the tax paid during the three years immediately preceding the filing of the claim.

The facts of the case now before us fall squarely within the situation contemplated by the provision mentioned

---

[1]. "The amount of the credit or refund shall not exceed the portion of the tax paid—

" (A) If a return was filed by the taxpayer, and the claim was filed within three years from the time the return was filed, during the three years immediately preceding the filing of the claim." See Senate Report No. 1631, 77th Congress, 2d Session, p. 155.