**In re GRAND JURY SUBPOENA DUC-ES TECUM ISSUED TO SOUTHERN MOTOR CARRIERS RATE CON-FERENCE, INC., DATED AUGUST 13, 1975.**

United States District Court,
N. D. Georgia,
Atlanta Division.

Dec. 5, 1975.

Robert M. Silverman, Antitrust Div., U. S. Dept. of Justice, Washington, D. C., for U. S.

Timothy R. Askew, Jr., Arnall, Golden & Gregory, Atlanta, Ga., for Southern Motor Carriers Rate Conference, Inc.

## ORDER

RICHARD C. FREEMAN, District Judge.

The instant action has arisen in connection with a Grand Jury proceeding convened to investigate possible criminal antitrust violations in the motor carrier industry. The action is presently before the court on (1) the motion of Southern Motor Carriers Rate Conference, Inc. [hereinafter "SMCRC"] to quash a subpoena duces tecum calling for the production of documents before the Grand Jury and (2) the government's motion to compel production of the documents.

Before turning to the merits of the instant motions, a brief review of the factual history of the proceedings is war-

ranted. On July 25, 1975 a Grand Jury was convened in the Northern District of Georgia to investigate the activities of SMCRC, its member carriers, groups, and associated organizations. The areas of inquiry relate primarily to intrastate rate-making practices of SMCRC, utilization of coercive and intimidating tactics by SMCRC upon members who attempted to publish rates independently or not in conformance with SMCRC views, and anticompetitive practices of SMCRC and its members impairing efforts by prospective entrants into the interstate motor carrier industry to acquire operating authority from the Interstate Commerce Commission [hereinafter "ICC"] and to gain approval of rates covering such new authority.

On or about August 14, 1975, SMCRC was served with a subpoena duces tecum requiring the production of documents before a Grand Jury on September 18, 1975. The subpoena was issued on the application of the United States at the request of the Antitrust Division of the Department of Justice. SMCRC filed a motion to quash the subpoena duces tecum predicated upon the following arguments: (1) SMCRC operates under an agreement with the ICC, in accordance with § 5a of the Interstate Commerce Act, 49 U.S.C. § 5b, and its rates and rate-making practices are immune from liability under the federal antitrust laws by virtue of 49 U.S.C. § 5b(9); (2) that the question of whether SMCRC's activities are outside the scope of its § 5a agreement is factual in nature and within the scope of the primary jurisdiction of the ICC; (3) that requiring SMCRC to produce the documents would be an unreasonable search and seizure prohibited by the Fourth Amendment; (4) that production of the documents would violate SMCRC's privilege against self-incrimination protected by the Fifth Amendment; (5) that the nature of the documents sought requires review, compilation, and copying of voluminous documents and is unduly burdensome and oppressive by subjecting SMCRC to unreasonable expense and would unduly in-

terfere and disrupt the conduct of movant's business; (6) that the government has access to all the documents and records sought through the ICC, *see* 49 U.S.C. § 5b(3); and (7) that documents sought are irrelevant and can be characterized as a "fishing expedition" extending beyond the legitimate scope and purpose of a Grand Jury investigation.

In conclusion, SMCRC's objections to the production of these documents is, in the first instance, jurisdictional, and secondly, relates to the purported burdensomeness of compliance with the subpoena duces tecum. The government has filed a response to SMCRC's motion to quash, as well as a motion to compel the production of these documents pursuant to the subpoena.

## JURISDICTION

The primary question presented by SMCRC on its motion to quash the instant subpoena relates to the authority of this court to order compliance with the subpoena in a Grand Jury proceeding investigating antitrust violations, when there is a possibility that some of defendant's activities may be expressly or impliedly immunized from antitrust prosecution by the provisions of the Interstate Commerce Act.

The gravamen of SMCRC's objections to the subpoena is predicated upon the fact that the Interstate Commerce Act expressly excepts agreements approved by the Interstate Commerce Commission [hereinafter "the Commission"] from the operation of the antitrust laws. Thus, SMCRC argues that it operates under an agreement approved by the Commission in accordance with § 5a of the Interstate Commerce Act. A limited exception to the antitrust laws is authorized in 49 U.S.C. § 5b(9), which provides in pertinent part:

> Any carrier party to an agreement between or among two or more carriers relating to rates, fares, . . . or charges . . . may . . . apply to the Commission for approval of the agreement . . . . [49 U.S.C. § 5b(2)]

Parties to any agreement approved by the Commission under this section and other persons are, . . . relieved from the operation of the antitrust laws with respect to the making of such agreement, and with respect to the carrying out of such agreement in conformity with its provisions and in conformity with the terms and conditions prescribed by the Commission.

Moreover, SMCRC contends that the question of whether any of its activities lies outside the scope of its 5a agreement is *factual* in nature and within the primary jurisdiction of the ICC. In conclusion, SMCRC asserts that unless and until the Commission determines that SMCRC engaged in activities beyond the scope of its agreement, the government may not circumvent the agency's primary jurisdiction through the means of a Grand Jury investigation which could only prove to be fruitless because defendant's conduct is immune from the operation of the federal antitrust laws.

The bulk of the documents sought by the government relates to rate-making and other activities engaged in by SMCRC in intrastate commerce. With respect to its intrastate activities, SMCRC argues that there is no federal jurisdiction over wholly intrastate commerce, or alternatively, that intrastate commerce must substantially affect interstate commerce before it can fall within the ambit of the federal antitrust laws. Thus, SMCRC asserts that to the extent its intrastate activities are within the stream of commerce, they are subject to the federal antitrust laws *only if* they are outside the scope of the 5a agreement and conditions prescribed by the ICC, and that under the doctrine of primary jurisdiction the Commission has the expertise and manpower to make the initial factual determination whether SMCRC's interstate and intrastate activities are within the scope of the 5a agreement.

The government, on the other hand, argues that the jurisdictional objections raised by SMCRC, based as they are upon claims of immunity, are premature

and challenge the historical and traditional role of the Federal Grand Jury in criminal investigations. Moreover, the government challenges SMCRC's characterization of the types of conduct that are and are not subject to regulation by the ICC. Both parties agree that there are three types of activities in question: (1) interstate activities by motor carriers, which are in the exclusive domain of ICC regulation; (2) intrastate commerce which is related to and has a substantial affect on interstate commerce; and (3) intrastate commerce which has no effect on interstate commerce and lies exclusively within the domain of state regulation. The government and SMCRC, however, dispute the jurisdiction of the ICC to regulate intrastate commerce which substantially affects interstate commerce and, hence, the potential immunity from the federal antitrust laws. Contrary to SMCRC's contention that the ICC may regulate such intrastate commerce to the extent that such intrastate activities may fall within the scope of the 5a agreement, the government argues that the scope of the Commission's authority is limited to the regulation of interstate commerce, although the antitrust laws are designed to remedy anticompetitive activities occurring wholly within a state which may substantially interfere with interstate commerce. This court agrees.

 Part II of the Interstate Commerce Act sets forth the scope of jurisdiction of the ICC to regulate motor common carriers. The relevant statute, 49 U.S.C. § 302(b), in defining the applicability of the provisions of the Act provides:

Nothing in this chapter shall be construed to affect the powers of taxation of the several States or to authorize a motor carrier to do an intrastate business on the highways of any State, *or to interfere with the exclusive exercise by each State of the power of regulation of intrastate commerce by motor carriers on the highways thereof.* (emphasis supplied)

Similarly, 49 U.S.C. § 316(e), which prescribes the power of the Commission to fix reasonable rates and regulations, provides that

nothing in this chapter shall empower the Commission to prescribe, or in any manner regulate, the rate, fare, or charge for *intrastate transportation,* or for any service connected therewith, *for the purpose of removing discrimination against interstate commerce or for any other purpose whatever.*

Thus, it is manifest that regulation of intrastate transportation is excepted from the Commission's authority, even insofar as it might remedy discriminatory effects on interstate commerce. Moreover, as the Government correctly points out, the legislative history of the Interstate Commerce Act provides further support for the proposition that the ICC's rate and rule-making authority over motor common carriers extends solely to interstate transportation. *See, e. g.,* H.R.Rep. No. 1645, 74th Cong., 1st Sess. 4 (1935); Cong.Rec. 74th Cong. 1st Sess., July 31, 1935, at 12204–279.[1]

 Finally, this court rejects any implications suggested by SMCRC that the inclusion of intrastate rates in its 5a agreement, i. e., where they might argu-

---

1. When the above-mentioned provisions of the Interstate Commerce Act were reported to the Senate floor, the Commerce Committee reported the bill with an amendment which would have extended the Commission's jurisdiction over motor carrier rates, to be coextensive with the ICC's jurisdiction over intrastate railroad rates, as set forth in the *Shreveport Rate Case,* [*Houston, East and West Texas Railway Co. v. United States*] 234 U.S. 342, 34 S.Ct. 833, 58 L.Ed. 1341 (1913). That case held that the Commission could cancel intrastate railroad rates when it found that those rates sub-

stantially affected interstate railroad rates in a discriminatory manner. That portion of the bill was expunged before being passed by the Senate. When the House Committee on Interstate and Foreign Commerce reported the bill, it amended it to prohibit "the extension of federal regulation in intrastate transportation that was exercised under the authority of the decision of the Supreme Court in the 'Shreveport' Case and of the provisions of Section 13(4) of the Interstate Commerce Act." *See* H.R.Rep. No. 1645, 74th Cong., 1st Sess. 4 (1935); 74 Cong.Rec. 12204–279 (July 31, 1935).

ably substantially affect interstate commerce, would *per se* immunize it from liability under the federal antitrust laws by reason of 49 U.S.C. § 5b(9). Thus, it has been frequently held that no tariff or rate may be interpreted so as to extend its application beyond the governmental agency with which it has been filed, particularly, where, as in the instant case, the Act expressly provides that the Commission does not have the authority to prescribe rates for intrastate transportation. 49 U.S.C. § 316(e); *Southern Pacific Co. v. United States,* 272 U.S. 445, 47 S.Ct. 542, 71 L.Ed. 343 (1926); *Greyhound Corp. v. United States,* 111 F.Supp. 259, 124 Ct.Cl. 758 (1953). Accordingly, since we conclude, as a *matter of law,* that the fixing of intrastate rates does not lie within the realm of authority of the Commission, we need not invoke the doctrine of primary jurisdiction to allow the Commission to make an initial factual determination as to whether any such rates may be contained in the 5a agreement and be immune from the operation of the federal antitrust laws.[2]

SMCRC has also objected to the production of documents pursuant to the subpoena duces tecum on the grounds that many of the documents relate to intrastate activity, whereas the Antitrust Division of the Justice Department is delegated authority to enforce the *federal* antitrust laws, *see* 28 C.F.R. 0.40(a), and a federal grand jury's investigation is similarly limited to investigation of

*federal* antitrust law violations. *Cf. United States v. Yellow Cab Co.,* 332 U.S. 218, 67 S.Ct. 1560, 91 L.Ed. 2010 (1947). Accordingly, SMCRC argues that transportation of goods between two points within a single state is too far removed from the investigatory power of the instant Grand Jury. The government, on the other hand, argues that the fixing of intrastate rates may have such a substantial affect on interstate commerce as to call into play the federal antitrust laws.

■ It is well settled that when Congress enacted the federal antitrust laws, it intended to exercise its full power over interstate commerce, so that coverage of the acts extends to "those activities intrastate which so affect interstate commerce, or the exertion of the power of Congress over it, as to make regulation of them appropriate means to the attainment of a legitimate end, the effective execution of the granted power to regulate interstate commerce." *United States v. Wrightwood Dairy Co.,* 315 U.S. 110, 62 S.Ct. 523, 86 L.Ed. 726 (1941); *Mandeville Island Farms v. American Crystal Sugar Co.,* 334 U.S. 219, 68 S.Ct. 996, 92 L.Ed. 1328 (1948); *Atlantic Co. v. Citizens Ice & Cold Storage Co.,* 178 F.2d 453 (5th Cir. 1949). Most recently, the Supreme Court has held that an intrastate minimum fee schedule published for lawyers had such a substantial effect on interstate commerce as to constitute a *per se* violation of the Sherman Act. *Goldfarb v. Vir-*

---

**2.** The *doctrine of primary jurisdiction is intended to apply primarily to cases in which the court has jurisdiction to grant a remedy upon the proof of the facts alleged, but the issues are such as fall within the special competence or "expertise" of an administrative agency in some field where uniformity of statutory policy or interpretation is desirable. Marnell v. United Parcel Service of America, Inc.,* 260 F.Supp. 391, 413 (N.D.Cal.1966); *United States v. Western Pac. R. R.,* 352 U.S. 59, 77 S.Ct. 161, 1 L.Ed.2d 126 (1956) (question of reasonableness of rates); *General American Tank Car Corp. v. El Dorado Terminal Co.,* 308 U.S. 422, 60 S.Ct. 325, 84 L.Ed. 361 (1940) (deferred to agency factual question of "reasonableness of rates"). In such a case the judicial process is usually stayed pending

referral of such issues to the administrative body for its views. The doctrine of primary jurisdiction is, however, inapplicable when the question is not one of fact requiring the fact-finding expertise of a federal agency, but rather one of law. *Meat Cutters v. Jewel Tea Co., Inc.,* 381 U.S. 676, 85 S.Ct. 1596, 14 L.Ed.2d 640 (1965). In the instant case, the questions before the court is solely legal, i. e., whether *the fixing of intrastate rates and anti-competitive conduct fall within the ambit of immunity under SMCRC's 5a agreement. Accordingly, it is unnecessary to refer the issue to the ICC, since the Interstate Commerce Act makes it clear that the Commission has no regulatory authority over intrastate rate-making of motor carriers.*

*ginia State Bar*, 421 U.S. 773, 95 S.Ct. 2004, 44 L.Ed.2d 572 (1975). While it is clear that the Supreme Court has refused to enforce the federal antitrust laws against one engaged in wholly intrastate activities where the transportation was found to be "too unrelated to interstate commerce to be a part thereof", *see, e. g., United States v. Yellow Cab Co., supra*, it would be premature for this court to adopt any *per se* rule blocking the opportunity of a Federal Grand Jury to investigate the facts concerning SMCRC's alleged intrastate rate fixing which the investigation might subsequently disclose has a substantial effect on interstate commerce. *Cf. Id.*, 332 U.S. at 232, 67 S.Ct. 1560 (refusing to establish a rigid rule that taxicab transportation to and from railroad stations and other modes of interstate commerce could never affect interstate commerce). Accordingly, this court concludes that SMCRC's jurisdictional arguments are not meritorious.

### THE MERITS OF SMCRC'S MOTION TO QUASH

SMCRC has also objected to the production of documents pursuant to the instant subpoena on the grounds that the documents are not relevant and that it would be unduly burdensome and oppressive to require SMCRC to comply with the subpoena since it entails review, compilation, and copying of voluminous documents at an unreasonable cost to SMCRC.

 Rule 17(c), Fed.R.Crim.P., authorizes the issuance of a subpoena duces tecum commanding the production of books, papers, documents, or other objects designated therein. When the person objects to the production of documents by a motion to quash the subpoena, the burden is on the party seeking production to show good cause therefor. In addition, Rule 17(c) provides that a court may modify a subpoena if compli-

ance would be unreasonable or oppressive. Thus, the key in determining the validity of a subpoena has been its "reasonableness" and the courts have generally adopted three criteria: (1) that the subpoena command only the production of materials relevant to the investigation; (2) that the subpoena specify the materials to be produced with reasonable particularity; and (3) that the subpoena command production of materials covering only a reasonable period of time. *United States v. Gurule*, 437 F.2d 239, 241 (10th Cir. 1970); *In Re Corrado Brothers, Inc.*, 367 F.Supp. 1126 (D.Del. 1973).

 In its brief in support of its motion to quash, SMCRC contends that it had never been advised of the scope of the Grand Jury investigation, and that it would be impossible for this court to determine the relevance of the documents sought. The government, in its response, has indicated that the Grand Jury was convened to investigate SMCRC, its members, and associated groups, in the areas of intrastate rate-making, and certain alleged coercive and anti-competitive practices of SMCRC with respect to discouraging new entrants into the motor carrier industry. SMCRC has failed, however, subsequently, to clarify and specify its objections to the relevancy of the documents sought, except with respect to the arguments of immunity which this court has rejected earlier in this order. Accordingly, in light of affidavits submitted by the government indicating that it has received complaints with respect to the activities under Grand Jury investigation,[3] this court concludes that the documents sought are relevant and not a mere "fishing expedition."

 SMCRC also objects to the reasonableness of the length of the time, for which the documents must be produced. The subpoena covers the period from January 1, 1972, until the date of

---

**3.** An affidavit attached to the motion to compel production of documents indicates that it has received documentary evidence in another Grand Jury investigation of the motor carrier industry and specific complaints regarding possible violations of the federal antitrust laws by SMCRC.

service of the subpoena, or a period of almost four years. It is well recognized that antitrust investigations are more extensive and intrusive than ordinary criminal investigations. *See, e. g., In Re Grand Jury Subpoena*, 203 F.Supp. 575 (S.D.N.Y.1961); *In Re Grand Jury Investigation of Shipping Industry*, 186 F.Supp. 298 (D.D.C.1960). Moreover, in light of the nature and scope of the inquiry, a time span of under four years does not seem unreasonable in light of previous antitrust investigations which have required the production of documents for a time period of from three to 27 years. *See, e. g., In Re United Shoe Machinery Corp.*, 7 F.R.D. 756 (D.Mass. 1947) (court reduced time period from 27 to 10 years); *In re Eastman Kodak Co.*, 7 F.R.D. 760 (W.D.N.Y.1957) (ten years); *Application of Radio Corp. of America*, 13 F.R.D. 167 (S.D.N.Y.1952) (18 years).

■ The gravamen of SMCRC's objections to the subpoena, however, is the burdensomeness and expense of requiring SMCRC to produce and copy the documents, particularly when a substantial number of the documents sought are allegedly already on file with the ICC, and, therefore, available to the government by independent means. *See* 49 U.S.C. § 5b(3). The court finds that these objections are without merit, because, in the first instance, the subject matter of the Grand Jury investigation *sub judice* relates primarily to the *intrastate* rate-making activities of SMCRC. As noted above, such activities are not within the scope of the Commission's authority and investigative powers; therefore, it is highly improbable that many of the documents sought would be in the possession of the ICC. Moreover, even assuming arguendo that the ICC has these documents in its possession, the Grand Jury is, of course, authorized to conduct its own independent investigation and is entitled to have produced before it "competent fresh evidence." *In Re Motions to Quash Subpoenas Duces Tecum*, 30 F.Supp. 527, 531 (S.D.Cal. 1939).

■ This court has concluded that the documents sought are relevant and not immune from production for the investigative purposes of the Grand Jury. As a general rule, only in the most extreme case of a clear showing of unreasonableness should the court grant a motion to quash an otherwise valid Grand Jury subpoena on the basis that it is overly burdensome. *In Re Corrado Brothers, Inc., supra*, at 1132; *Petition of Borden Co.*, 75 F.Supp. 857, 863 (N.D. Ill.1948). This court, while agreeing with SMCRC's contentions that compliance with the subpoena would be inordinately expensive, nevertheless, concludes that the instant subpoena duces tecum should not be quashed.

■ Counsel for SMCRC, in an affidavit attached to its motion to quash, avers that assembling and copying of the documents required to be produced pursuant to the subpoena would consume an estimated 125,700 to 243,294 man-hours at a cost to it of $908,811.00 to $1,759,-015.62, and that the production of these documents would entirely disrupt SMCRC's business. Moreover, it is averred that SMCRC is a non-profit organization which had gross income of $3,261,-581, and gross expenses of $3,251,947, leaving a balance of $9,634 carried forward to 1975. SMCRC has also attached photographs of some of the file cabinets, the contents of which would be required to be produced to comply with the subpoena, as a further indication of the tremendous volume of the materials sought. Accordingly, SMCRC argues that the subpoena constitutes an unlawful search and seizure violative of the Fourth Amendment, and a violation of its due process rights under the Fifth Amendment. Apparently, with respect to the latter contention, SMCRC is relying on arguments similar to those raised and rejected in *United States v. International Business Machines Corp.*, 62 F.R.D. 507 (S.D.N.Y.1974), that requiring the corporation to absorb the costs of complying with the subpoena would constitute a taking of property without due process of law in violation of the Fifth

Amendment. In that antitrust case, the District Court for the Southern District of New York, relied upon language of Judge Weinfeld in *Application of Radio Corporation of America, supra,* at 172, where he stated

> Inconvenience is relative to size. Any witness who is subpoenaed suffers inconvenience. An individual operating a small business, for example, or a corporation operated by a sole shareholder, may suffer, in like circumstances, more inconvenience than [a major corporation] with . . . thousands of employees. But this inconvenience, whether suffered by witnesses, grand jurors, or jurors, is part of the price we pay to secure . . . the enforcement of our laws.

*Id.* at 510.

The district court, therefore, concluded that movants, such as Honeywell, Xerox, and RCA "have greater resources to bear these costs." *Id.* Unfortunately, under the present circumstances it is virtually impossible for SMCRC to comply with this subpoena at its own expense. *See, e. g., Application of Harry Alexander,* 8 F.R.D. 559 (S.D.N.Y.1949); *In Re Grand Jury Investigation (General Motors Corp.),* 174 F.Supp. 393 (S.D.N.Y. 1959). Nevertheless, it would be equally inequitable for this court to foreclose an otherwise valid Grand Jury investigation simply because SMCRC cannot bear the costs of producing the documents itself.

The court notes that several recent decisions considering expansive subpoenas such as that *sub judice* have held that compliance would not be unreasonably burdensome or oppressive, where, for example, the government or one of its agencies agreed to provide the personnel and equipment to search for, assemble, and copy the requested documents. *See United States v. Continental Bank & Trust Co.,* 503 F.2d 45 (10th Cir. 1974). Similarly, another court has held that a subpoena duces tecum was not unreasonable where the summons did not require that the documents be transported, and the bank could comply by providing access to its records to federal agents who would supply their own copying equipment. *See United States v. Dauphin Deposit Trust Co.,* 385 F.2d 129 (3rd Cir. 1967), *cert. denied,* 390 U.S. 921, 88 S.Ct. 854, 19 L.Ed.2d 981. Yet another case considering the potential burden of complying with the subpoena, while holding that it would be unacceptable for Internal Revenue Service agents to search the bank's records, nevertheless, required production of the documents, stating:

> The only means available for maintaining both a minimum of cost and the confidentiality which such records deserve in the normal instance is to obligate the IRS to pay to the bank the actual cost of search for such records that they wish to have. My reasoning is obvious. Faced with the obligation to pay the cost of such a search, the IRS will impose upon itself those limitations which will insure that the records sought do exist . . . do have a bearing on the taxpayer's income tax liability, and that the IRS has exhausted all other and less costly alternatives to obtain the same documents.

> If the IRS follows these self-imposed limitations we can be assured that in the future that the summonses will not be overly broad and will be confined to only relevant material.

*United States v. Friedman, etc.,* 388 F.Supp. 963, 970 (W.D.Pa.1975). Without expressing a view as to the preferable manner in which these undoubtedly relevant documents might be obtained, this court is certain that SMCRC and the government can by mutual agreement propose a method by which these documents may be produced for the Grand Jury.

Accordingly, for the reasons hereinabove expressed, the motion of Southern Motor Carriers Rate Conference, Inc. to quash the instant Grand Jury subpoena duces tecum is hereby denied, and the government's motion to compel production of documents is hereby granted, upon condition that the government advance the costs to be incurred in inspecting, assembling, and photocopying the

documents, or supply personnel and equipment to perform the inspection and production of the subpoenaed documents.

It is so ordered.