UNITED STATES of America

v.

SOUTHERN MOTOR CARRIERS RATE
CONFERENCE et al.

Civ. A. No. 76–1909A.

United States District Court,
N. D. Georgia,
Atlanta Division.

July 8, 1977.

Robert M. Silverman, Robert N. Dempsey, Judy L. Goldstein, Antitrust Div., U.S. Dept. of Justice, Washington, D.C., John W. Stokes, Jr., U.S. Atty., Atlanta, Ga., for the U.S.

J. Raymond Clark, Lindsay C. Warren, Jr., Goldsboro, N.C., for Motor Carriers Traffic Ass'n.

Allen I. Hirsch, Ellis G. Arnall, Arnall, Golden & Gregory, Atlanta, Ga., for Southern Motor Carriers Rate Conference; Homer S. Carpenter, Rice, Carpenter & Carraway, Washington, D.C., of counsel.

Charles L. Gowen, King & Spalding, Chas. M. Shaffer, Jr., Atlanta, Ga., for N.C. Motor Carriers Ass'n.

### ORDER

RICHARD C. FREEMAN, District Judge.

This is an action brought by the United States Government pursuant to § 4 of the Sherman Act, 15 U.S.C. § 4,[1] seeking to enjoin and restrain alleged continuing violations by the defendants of § 1 of the Sherman Act, 15 U.S.C. § 1.[2] The gravamen of the instant complaint is that the three rate conference defendants, Southern Motor Carriers Rate Conference, Inc. [hereinafter "SMCRC"], Motor Carriers Traffic Association, Inc. [hereinafter "MCTA"], and North Carolina Motor Carriers Association, Inc. [hereinafter "NCMCA"] and other unnamed coconspirators have engaged in a continuing conspiracy to fix rates charged for intrastate for-hire transportation of commodities within the states of Alabama, Georgia, Mississippi, North Carolina, and Tennessee. The action is presently pending before this court on (1) motions to dismiss filed by defendants SMCRC, NCMCA, and MCTA and (2) on the Government's motion to strike several defenses from the answers of defendants, SMCRC and NCMCA. See Rule 12(f), Fed.R.Civ.P.

### DEFENDANTS' MOTIONS TO DISMISS

SMCRC has moved to dismiss the complaint for lack of subject matter jurisdiction, see Rule 12(b)(1), Fed.R.Civ.P., on the grounds that the activities alleged herein to be violative of the federal antitrust laws are subject to the exclusive regulation of the respective states in which such activities are alleged to have occurred and (2) for failure to state a claim because the activities sought to be enjoined constitute neither a material obstruction to nor any anticompetitive interference with the free flow of commerce. See Rule 12(b)(6). The remaining defendants have specifically adopted the arguments and the briefs filed by defendant SMCRC.

### SUBJECT MATTER JURISDICTION

All of the defendants herein are rate-making conferences which publish and propose on behalf of their members both interstate and intrastate rates relating to the transportation of general commodities by common carriers within the foregoing states in the southeastern portion of the United States. All three of the defendants are established rate-making conferences under bylaws and rules of procedure approved by the Interstate Commerce Commission [hereinafter the "Commission" or the "ICC"], pursuant to § 5a of the Interstate Commerce Act, 49 U.S.C. § 5b. The grava-

---

1. Section 4 of the Sherman Act, 15 U.S.C. § 4, provides in pertinent part:

 "The several district courts of the United States are invested with jurisdiction to prevent and restrain violations of sections 1 to 7 of this title; and it shall be the duty of the several United States attorneys, in their respective districts, under the direction of the Attorney General, to institute proceedings in equity to prevent and restrain such violations. . . ."

2. Section 1 of the Sherman Act, 15 U.S.C. § 1, provides in relevant part:

 "Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal: . . ."

men of the government's complaint for injunctive relief is that the collective initiation, proposal, and "establishment" of intrastate rates routinely acquiesced in by state regulatory commissions and the enforcement thereof constitute *per se* violations of § 1 of the Sherman Act, and that such activities have a substantial anticompetitive effect on interstate commerce. The primary thrust of defendants' motions to dismiss appears to be their contention that Congress did not intend to impose antitrust liability for the collective initiation of intrastate rates which are subjected to state regulation, and has reserved such supervisory and regulatory power expressly to the States.

■ It is well settled that "[r]egulated industries are not *per se* exempt from the Sherman Act." *State of Georgia v. Pennsylvania Railroad Company*, 324 U.S. 439, 65 S.Ct. 716, 89 L.Ed. 1051 (1945). However, numerous federal regulatory statutes provide express immunity from antitrust liability for certain conduct approved by the regulatory agency. *E. g.*, Federal Aviation Act, 49 U.S.C. § 1384; Federal Communications Act, 47 U.S.C. §§ 221(a), 222(c)(1); The Shipping Act of 1916, 46 U.S.C. § 814. Section 5a of the Interstate Commerce Act (the Reed-Bullwinkle Act) [hereinafter the "Act"], 49 U.S.C. § 5b, is one of the express exemptions from the antitrust laws and was added to the Act to counteract the effect of the *Georgia v. Pennsylvania Railroad Co.* decision. That section provides that any carrier who is a party to an agreement approved by the Commission is "relieved from the operation of the antitrust laws with respect to the making of the agreement" and further with respect to the carrying out of the agreement in conformity with its provisions and in conformity with the terms and conditions prescribed by the Commission. 49 U.S.C. § 5b. The Act also exempts certain unifications, mergers, and acquisitions approved by the Commission. *See* 49 U.S.C. §§ 5(2), 5(11). Since the complaint herein is specifically addressed to alleged collective fixing of intrastate rates wholly outside the authority of the Commission, neither of these express provisions of antitrust immunity are at issue herein. *See generally, Marnell v. United Parcel Service of America, Inc.*, 260 F.Supp. 391 (N.D.Cal.1966).

Defendants, however, rely on two other provisions of the Part II of the Interstate Commerce Act, the Motor Carrier Act, which deny the ICC rate-making authority with respect to intrastate transportation and reserve such regulation to the state. Accordingly, defendants conclude that a federal court is thereby ousted of jurisdiction to consider whether such intrastate rate-making activities violate federal antitrust law because of the alleged Congressional intent not to regulate such activities. Specifically, defendants rely upon 49 U.S.C. § 302(b) of Part II of the Act, which, in defining the applicability of the Act, provides:

> Nothing in this chapter shall be construed to affect the powers of taxation of the several States or to authorize a motor carrier to do an intrastate business on the highways of any State, or to interfere with the exclusive power of regulation of intrastate commerce by motor carriers on the highways thereof.

Similarly, 49 U.S.C. § 316(e), which prescribes the rate-making and regulatory powers of the Commission with respect to interstate commerce, further provides that:

> Nothing in this chapter shall empower the Commission to prescribe, or in any manner regulate, the rate, fare, or charge for intrastate transportation, or for any service connected therewith, for the purpose of removing discrimination against interstate commerce or for any other purpose whatever.

Defendants apparently concede that, consistent with the Commerce Clause, Article 1, § 8, U.S.Const., Congress could have authorized the Commission to regulate rates charged by motor carriers between points within a state where such transportation was in the stream of commerce and the rates were found to have a substantial effect on interstate commerce. *See Shreveport Rate Cases [Houston East & West Tex-*

*as Railway Co. v. United States* ], 234 U.S. 342, 34 S.Ct. 833, 58 L.Ed. 1341 (1913). However, as defendants correctly note, Congress, in enacting the motor carrier provisions expressly expunged portions of the proposed bill which would have allowed the ICC to cancel intrastate rates which were found to have had a discriminatory effect on interstate commerce. The House Committee report reflected that the Committee had amended the bill to prohibit "the extension of federal regulation in interstate transportation that was exercised under the authority of . . . the *Shreveport Case* . . . " *See* H.Rep.No. 1645, 74th Cong. 1st Sess. 4 (1935). *See also* 74 Cong.Rec. 12204–279 (July 31, 1935).

Reduced to its lowest terms, defendants appear to be arguing that the foregoing provisions of the Motor Carrier Act constitute an implied exemption from the federal antitrust laws since application of these provisions and the antitrust laws to the matters alleged in the complaint would result in a repugnance between the antitrust laws and the regulatory and transportation policy reserving consideration of the reasonableness of intrastate rates exclusively to the individual states.

■ "It is, of course, a cardinal rule of statutory construction that repeals by implication are not favored." *United States v. United Continental Tuna Corp.*, 425 U.S. 164, 96 S.Ct. 1319, 1323, 47 L.Ed.2d 653 (1976); *Radzanower v. Touche Ross & Co.*, 426 U.S. 148, 96 S.Ct. 1989, 1993, 48 L.Ed.2d 540 (1976). *See also Silver v. New York Stock Exchange*, 373 U.S. 341, 357, 83 S.Ct. 1246, 10 L.Ed.2d 389 (1963). Likewise, "[r]epeals of the antitrust laws by implication from a regulatory statute are strongly disfavored, and have only been found in cases of plain repugnancy between the antitrust and regulatory provisions." *United States v. Philadelphia National Bank*, 374 U.S. 321, 350–51, 83 S.Ct. 1715, 1734–35, 10 L.Ed.2d 915 (1963); *Gordon v. New York Stock Exchange*, 422 U.S. 659, 682, 95 S.Ct. 2598, 45 L.Ed.2d 463 (1975); *Carnation Co. v. Pacific Westbound Conference*, 383 U.S. 213, 232, 86 S.Ct. 781, 15 L.Ed.2d 709 (1966).

Nevertheless, in certain instances, a regulatory scheme may be so pervasive that it must displace the antitrust laws in particular and discrete instances; however, immunity is to be implied only where necessary to make the regulatory scheme work, and even then only to the minimum extent necessary to afford the agency the ability to carry out its regulatory mandate. *E. g., Gordon v. New York Stock Exchange, Inc., supra*, 422 U.S. at 682–83, 95 S.Ct. 2598; *United States v. National Association of Securities Dealers, Inc.*, 422 U.S. 694, 719–20, 95 S.Ct. 2427, 45 L.Ed.2d 486 (1975); *Silver v. New York Stock Exchange*, 373 U.S. 341, 83 S.Ct. 1246, 10 L.Ed.2d 389 (1963); *Pan American World Airways, Inc. v. United States*, 371 U.S. 296, 83 S.Ct. 476, 9 L.Ed.2d 325 (1963). In sum, the Supreme Court has long recognized that the federal antitrust laws represent a fundamental national economic policy and therefore will not lightly assume that a regulatory scheme for specific aspects of an industry was intended to render the more general provisions of the antitrust laws wholly inapplicable to that industry. *See United States v. Borden Co.*, 308 U.S. 188, 198–99, 60 S.Ct. 182, 84 L.Ed. 181 (1939).

■ The provisions of the Motor Carrier Act relied upon by defendants cannot be said to be in "irreconcilable conflict" with the antitrust laws in the sense that there is a positive repugnancy between them or that they cannot mutually coexist or in the sense that the application of the antitrust laws will vitiate the effectiveness and unduly interfere with the operation of the Motor Carrier Act. *Compare Gordon v. New York Stock Exchange, supra, with Radzonower v. Touche Ross & Co., supra.* Presumably, the application of the federal antitrust laws to the interstate rates and charges fixed by motor carriers or jointly through their collective rate conferences and approved by the Commission as an appropriate exercise of its authority would create such an irreconcilable conflict warranting nonapplication of the federal antitrust laws had Congress not chosen to provide the express exemption in § 5a.

On the other hand, 49 U.S.C. §§ 302(b) and 316(e), merely provide that the Commission has no direct power to regulate intrastate rate-making or to approve intrastate rates proposed by common carriers, even assuming that such rates may have some effect on interstate commerce. Thus, there is no conflict between the regulatory authority of the Commission and the application of the federal antitrust laws in the context of intrastate rates for motor carrier transportation, since the ICC has no jurisdiction over that domain. 49 U.S.C. §§ 302(b) and 316(e) merely reserve to the individual states the direct regulation of intrastate motor carrier rates within their boundaries. Indeed, the statutory provisions relied upon by defendants do not even guarantee, require, or assure that state regulatory agencies will be established to ensure salutary competition among motor carriers or that reasonable intrastate rates are established, or that even if such a state regulatory exists, it will consider what anticompetitive effects such rates may have on interstate commerce. Likewise, these provisions do not necessarily establish a standard other than one of competition with respect to intrastate motor carrier transportation. Such an implied exemption should not be lightly inferred particularly in light of the well established principle that Congress in enacting the federal antitrust laws, intended to exercise its full power over interstate activities so that the coverage of the federal antitrust laws extends to such activities intrastate which substantially affect interstate commerce. *E. g., Mandeville Island Farms v. American Crystal Sugar Co.,* 334 U.S. 219, 68 S.Ct. 996, 92 L.Ed. 1328 (1948); *United States v. Wrightwood Dairy Co.,* 315 U.S. 110, 62 S.Ct. 523, 86 L.Ed. 726 (1941); *In re Grand Jury Subpoena Duces Tecum,* 405 F.Supp. 1192 (N.D.Ga.1975).[3] In sum, 49 U.S.C. §§ 302(b) and 316(e) are not tantamount to a repeal by implication

of the federal antitrust laws insofar as intrastate rate-making of motor carriers may have a substantial anticompetitive effect on interstate commerce.

Accordingly, for the reasons hereinabove expressed, defendants' motions to dismiss for lack of subject matter jurisdiction are hereby DENIED.

## DEFENDANTS' MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM

The defendants have further moved to dismiss the complaint on the grounds that it fails to state a claim upon which relief can be granted, *see* Rule 12(b)(6), on the ground that states have the plenary power to regulate matters of local concern, including, commerce within the state despite insignificant effects that such state regulation may have on interstate commerce, particularly where Congress, as in the Motor Carrier Act, has chosen not to act directly. Defendants rely principally upon *Southern Pacific Co. v. Arizona,* 325 U.S. 761, 65 S.Ct. 1515, 89 L.Ed. 1915 (1945), in which the Supreme Court set forth the distinction between Congressional power to regulate commerce wholly interstate as opposed to intrastate activities having a substantial effect on interstate commerce, noting:

> When the regulation of matters of local concern is local in character and effect, and its impact on the national commerce does not seriously interfere with its operation, and the consequent incentive to deal with them nationally is slight, such regulation has generally held to be within state authority. (citations omitted).

*Id.* at 767, 65 S.Ct. at 1519.

Moreover, defendants further contend that "at no place in the complaint has it been alleged that any of the assailed activities of the defendants has materially obstructed the free flow of interstate commerce.

---

**3.** Recent decisions of the Supreme Court recognize that the jurisdictional reach of the Sherman Act has expanded along with the broadening of the Court's view of Congressional power under the Commerce Clause. *See, e. g., Cantor v. Detroit Edison Co., infra,* 428 U.S. 579, at 635, 96 S.Ct. 3110, at 3138, 49 L.Ed.2d 1141

(Stewart, J.) (dissenting); *Hospital Building Co. v. Rex Hospital Trustees,* 425 U.S. 738, at 743 n. 2, 96 S.Ct. 1848, at 1852, 48 L.Ed.2d 338; *Gulf Oil Corp. v. Copp Paving Co.,* 419 U.S. 186, 201–202, 95 S.Ct. 392, 42 L.Ed.2d 378 (1974).

Rather, the complaint speaks in terms of burdening, restraining, substantially affecting interstate commerce." Therefore, defendants' argument is twofold: (1) that the alleged effect on commerce is minimal and not amounting to a substantial effect such as "obstruction or interruption" of the stream of commerce, and (2) that national transportation policy, as evidenced by the Motor Carrier provisions, prohibits direct regulation of the intrastate operations of motor carriers since such regulation is exclusively reserved for the states. *See* 49 U.S.C. §§ 302(b), 316(e).

■ The Sherman Act prohibits every contract, combination, or conspiracy "in restraint of trade or commerce among the several States", 15 U.S.C. § 1, and prohibits monopolizing "any part of the trade or commerce among the several States." 15 U.S.C. § 2. Thus, the Sherman Act has been expansively read to encompass not only mere restraints on trade that are motivated by an intent to limit interstate commerce, or that have their sole impact on interstate commerce, *Hospital Building Co. v. Trustees of Rex Hospital*, 425 U.S. 738, 96 S.Ct. 1848, 1852, 48 L.Ed.2d 338 (1976), and may also include activities whose economic effects on interstate commerce are indirect as well as direct. *Wickard v. Filburn*, 317 U.S. 111, 125, 63 S.Ct. 82, 87 L.Ed. 122 (1942). Therefore, restraints which appear wholly local in nature can produce the effects condemned by the Sherman Act, and the standard governing the requisite nexus between the challenged activity and interstate commerce is whether the restraint in question "substantially and adversely affects interstate commerce." *E. g., Gulf Oil Corp. v. Copp Paving Co.*, 419 U.S. 186, 195, 95 S.Ct. 392, 398, 42 L.Ed.2d 378 (1974); *Mandeville Island Farms, Inc. v. American Crystal Sugar Co., supra*, 334 U.S. at 219, 68 S.Ct. 996; *Hospital Building Co. v. Trustees of Rex Hospital, supra*, 425 U.S. at 743, 96 S.Ct. at 1852. Finally, in determining the extent of Sherman Act coverage, "[i]t is in a practical sense that we must view an effect on interstate commerce." *Goldfarb v. Virginia State Bar Association*, 421 U.S. 773, 784 n. 11, 95 S.Ct. 2004, 2011, 44 L.Ed.2d 572 (1975); *Swift & Co. v. United States*, 196 U.S. 375, 378, 25 S.Ct. 276, 49 L.Ed. 518 (1905).

Summarizing the allegations of the instant complaint, the Government has alleged that defendants are corporate rate conference bureaus, that on behalf of their member motor carriers set, fix, and publish certain rates for the intrastate for-hire transportation of general commodities within one or all of the five southern states mentioned above; that such rate-fixing activities are participated in by other unnamed co-conspirators; that other activities are performed in furtherance of the conspiracy;[4] and that the members of the named defendant conferences have derived revenues in excess of $80,000,000 per year from the intrastate for-hire transportation of general commodities within the southern region. With respect to the "in commerce" requirement, the complaint further alleges that shippers engaged in private transportation across state boundaries combine their own private interstate transportation with the intrastate for-hire transportation to effectuate the necessary movement of general commodities. Thereafter, it is alleged that upon arrival in one of the southern states under consideration, the commodities are transferred to one or more of the member motor carriers for delivery to destinations within the state, which have been predesignated by the shippers at the commencement of the interstate movement. As a consequence, the commodities are alleged to have been transported in a continuous and uninterrupted stream from points

---

4. The overt acts allegedly taken in connection with the conspiracy include, in addition to rate-making, *inter alia*: utilizing SMCRC personnel to compile and prepare traffic studies, costs, and other data compiled in charts, testimony, and exhibits for use in presentations before the state agencies in justification of collusively set intrastate rate proposals, and utilization of the collusively set intrastate rates and the interstate rates prevailing in the Southern states as rate comparisons to justify collusively set intrastate rate filings before state agencies in each state.

out of states to destinations within each of the states, and that the motor carriers intrastate perform an integral part of the overall transportation of commodities, with the result that such intrastate motor carriers have a substantial and direct affect upon interstate commerce. The Government alleges that the collusively set rates, published, established by the defendants jointly or severally and their member carriers has directly, unreasonably, and arbitrarily burdened and restrained interstate commerce by raising, stabilizing, and maintaining such intrastate rates at an artificial level and thereby suppressing rate competition, to the ultimate detriment of shippers patronizing member carriers as well as to the ultimate consumers, both nationally and within the states, all of which are alleged to have had a substantial affect on interstate commerce.

■■■ Taking the Government's allegations as true and construed in the light most favorable to plaintiff, as we must for purposes of the motion to dismiss *sub judice, e. g., Jenkins v. McKeithen*, 395 U.S. 411, 421–22, 89 S.Ct. 1843, 23 L.Ed.2d 404 (1969); *Gardner v. Toilet Goods Association*, 387 U.S. 167, 87 S.Ct. 1526, 18 L.Ed.2d 704 (1967), this court is led to the inexorable conclusion that the well-pleaded facts herein satisfy the requisite nexus between defendants' conduct and interstate commerce to state a claim under the Sherman Act. Contrary to defendants' assertions, the interrelationship between intrastate for-hire transportation and the proposed anticompetitive effects of the alleged rate-fixing conspiracy on interstate commerce are certainly less tenuous than those found to be sufficient in numerous recent decisions by the Supreme Court. *E. g., Hospital Building Co. v. Trustees of Rex Hospital, supra,* 425 U.S. at 745–747, 96 S.Ct. at 1853–54; *Goldfarb v. State Bar of Virginia,* 421 U.S. at 783–785, 95 S.Ct. at 2011–12; *See also Boddicker v. Arizona State Dental Association,* 549 F.2d 626 (9th Cir.1977). Nor can we conclude that the intrastate transportation of goods by member carriers which produce revenues in excess of $80,000,000.00 per year and the alleged rate-fixing in con-

nection with such intrastate transportation, which often follows the shipment of goods interstate, is essentially local in nature or that it could merely have such a slight impact on interstate commerce that the incentive to deal with such anticompetitive activities nationally is *de minimus.*

■■■ In sum, the allegations fairly claim that to the extent that the conspiracy is successful, the defendants' alleged anticompetitive activities place an unreasonable burden on the free and uninterrupted flow of interstate commerce and are wholly adequate to state a claim under the Sherman Act. In any event, a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that plaintiff can prove no set of facts in support of his claim which would entitle him to relief. *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). *Quinonez v. National Association of Securities Dealers,* 540 F.2d 824, 826–27 (5th Cir.1976). Moreover, particularly in antitrust cases, where the proof is largely in the hands of the alleged conspirators, summary dismissals prior to allowing the plaintiff ample opportunity for discovery should be granted even more sparingly. *E. g., Poller v. Columbia Broadcasting System, Inc.,* 368 U.S. 464, 82 S.Ct. 486, 7 L.Ed.2d 458 (1962); *Hospital Building Co. v. Trustees of Rex Hospital, supra,* 425 U.S. at 745, 96 S.Ct. at 1853; *Ballard v. Blue Shield of Southern West Virginia, Inc.,* 543 F.2d 1075 (4th Cir.1976). Therefore, in the antitrust context, it has been held that the complaint should not be dismissed unless it appears that "the relation of the subject to interstate commerce and its affect upon it are clearly nonexistent." *E. g., A. Cherney Disposal Company v. Chicago & Suburban Refuse Disposal Association,* 484 F.2d 751, 759 (7th Cir. 1973), *cert. denied,* 414 U.S. 1131, 94 S.Ct. 870, 38 L.Ed.2d 755 (1974); *Marks Food Corporation v. Barbara Ann Baking Co.,* 274 F.2d 934, 936 (9th Cir.1960); *United States Dental Institute v. American Association of Orthodontists,* 396 F.Supp. 565, 577 (N.D.Ill. 1975). The facts alleged herein in the instant complaint are sufficient to satisfy the foregoing liberal standards.

Accordingly, for the reasons hereinabove expressed, defendants' motions to dismiss for failure to state a claim are hereby DENIED.

## THE GOVERNMENT'S MOTION TO STRIKE CERTAIN DEFENSES

We turn next to the Government's motion to strike certain affirmative defenses raised by defendants in their respective answers. *See* Rule 12(f), Fed.R.Civ.P. In particular, as to defendant SMCRC, the Government seeks to strike the following affirmative defenses: (1) the doctrine of *Parker v. Brown,* 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1943); (2) the *Noerr-Pennington* doctrine; (3) the unfairness doctrine; (4) the "Doctrine of Primary Jurisdiction"; (5) "Exhaustion of Administrative Remedies"; (6) "Unclean Hands" and as to defendant NCMCA, the Government has moved to strike defenses relating to: (a) "State Action Doctrine"; (b) *Noerr-Pennington* doctrine; (c) First Amendment.

It is axiomatic that motions to strike are not favored and are, therefore, infrequently granted. *See, e. g., Croy v. Skinner,* 410 F.Supp. 117, 132 (N.D.Ga. 1976); *Moreman v. Georgia Power Co.,* 310 F.Supp. 327 (N.D.Ga.1969); *Great Northern Paper Co. v. Babcock & Wilcox Co.,* 46 F.R.D. 67 (N.D.Ga.1968). Similarly, such motions may not be used to test the evidentiary sufficiency of the pleadings. *See id.; Augustus v. Board of Public Instruction,* 306 F.2d 862 (5th Cir.1962). Therefore, such motions will not be granted unless the allegations are so immaterial that they can have no possible bearing on the issues at trial and unless their presence unduly prejudices the opposing party, especially in complex cases. *E. g., United States Dental Institute v. American Association of Orthodontists,* 396 F.Supp. 565, 582 (N.D.Ill.1975); *Kinee v. American Aviation Corp.,* 64 F.R.D. 435, 440 (D.N.D.1974); *Gilbert v. Eli Lilly & Co., Inc.,* 56 F.R.D. 116, 120–21 (D.P.R.1972). Professors Wright and Miller summarize the judicial reluctance to grant motions to strike and their limited utility as follows:

In sum, a motion to strike will not be granted if the insufficiency of the defense is not clearly apparent, or if it raises factual issues that should be determined on a hearing on the merits.

5 C. Wright & A. Miller, *Federal Practice & Procedure,* § 1381 at 802 (1969).

In attacking the sufficiency of the panoply of antitrust defenses raised by the instant defendants, the Government does not appear to be arguing that such defenses are *per se* frivolous or that the Government would succeed on the merits despite adequate proof of the defense. *Compare International Latex Corp. v. Lexicon Products, Inc.,* 37 F.R.D. 524 (E.D.Pa.1965); *United States v. Foust Distilling Co.,* 36 F.R.D. 92 (E.D.Pa.1960). On the contrary, despite the Government's assertion that the issues presented by the motion to strike are wholly legal and that the merits of such defenses are ripe for adjudication, it appears that in most instances the Government is arguing that the defenses are false, in fact, which arguably could be more appropriately adjudicated in connection with a motion for partial summary judgment. *E. g., Forstmann Woolen Co. v. Murray Sices Corp.,* 10 F.R.D. 367, 372 (E.D.N.Y.1950). *See generally,* C. Wright & A. Miller, *supra,* § 1381 at 804. With these general caveats in mind, we turn to a more detailed examination of the sufficiency of the various defenses.

## STATE ACTION DOCTRINE AND UNFAIRNESS DOCTRINE

In *Parker v. Brown,* 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1943), the Supreme Court held that a program destructive of competition which "derived its authority and its efficacy from the legislative command of the state was not a violation of the Sherman Act because the Act was intended to regulate private practices and not to prohibit a state from imposing a restraint as an act of government." *Id.* at 350–52, 63 S.Ct. at 313; *Goldfarb v. Virginia State Bar, supra,* 421 U.S. at 791, 95 S.Ct. 2004; *Olsen v. Smith,* 195 U.S. 332, 344–45, 25 S.Ct. 52, 49 L.Ed. 224 (1904). The facts in *Parker* showed that the state had adopted

an anticompetitive agricultural marketing program as a result of legislation which was designed to ameliorate certain devastating effects that the free market system had had on agricultural prices of raisins in the State of California. The legislation had prescribed the terms of the program's operation, and set up a regulatory agency for regulation and operation of the program. The defendants in *Parker* were state officials sued in their official capacities. Thereafter, in *Goldfarb v. Virginia State Bar, supra,* 421 U.S. at 791, 95 S.Ct. 2004, a unanimous Court refused to hold that minimum fee schedules established by a county bar association were shielded from antitrust attack under the state action doctrine enunciated in *Parker.* The Court observed that the threshold inquiry "is whether the activity is *required* by the State acting as sovereign." 421 U.S. at 790, 95 S.Ct. at 2015 (emphasis supplied). In *Goldfarb,* the relevant facts showed that the state bar association had approved the fee schedules, and the Virginia Supreme Court had allowed the state bar to issue ethical opinions approving the schedules. It was further demonstrated that for limited purposes that state bar association was deemed to be a state agency by law, and that the state legislature had authorized the Supreme Court of Virginia to regulate the practice of law, although the Supreme Court of Virginia had taken no action with respect to the fixing of fees. In refusing to shield the activities from antitrust attack the U. S. Supreme Court held that it was "not enough that anticompetitive conduct [was] 'prompted' by state action . . ." *Id.* at 790, 95 S.Ct. at 2005.

Most recently, a plurality of the members of the Supreme Court have observed that mere "state authorization, approval, encouragement, or participation in restrictive private conduct confers no antitrust immunity." *Cantor v. Detroit Edison Co.,* 428 U.S. 579, 592, 96 S.Ct. 3110, 3118, 49 L.Ed.2d 1141 (1976). Rather to be shielded from antitrust laws, "anticompetitive activities must be compelled by the State acting as sovereign." *Id. Goldfarb v. Virginia State Bar, supra,* 421 U.S. at 791, 95 S.Ct. [2004]

at 2115; *Schwegmann Bros. v. Calvert Corp.,* 341 U.S. 384, 389, 71 S.Ct. 745, 95 L.Ed. 1035 (1952). In a recent decision this circuit has construed *Cantor* as restricting *Parker* to the proposition that state action immunity will be conferred only when state officials are defendants, but will not be available to mere private parties acting with the authorization of the state. *Litton Systems, Inc. v. Southwestern Bell Telephone Co.,* 539 F.2d 418, 423 (5th Cir.1976). That construction appears to be consonant with observations in the plurality opinion in *Cantor* to the effect that "[s]ince the case now before us does not call into question the legality of any act of the State of Michigan or any of its officials or agents, it is not controlled by the *Parker* decision." *Cantor, supra,* 428 U.S. at 591, 96 S.Ct. at 3117. *But see Cantor, supra,* 428 U.S. 591 at 603, 96 S.Ct. at 3123 (Burger, C. J.) (concurring) (*Parker* immunity conferred where the challenged activity is the "result" of state action), *Contra Cantor, supra,* 428 U.S. at 614, 96 S.Ct. at 3132 (Stewart, J.) (dissenting).

Even assuming arguendo, that the Supreme Court in *Cantor* fashioned an absolute rule that *Parker* immunity is only conferred when the action of the State or its officials is challenged, the Court did recognize the unfairness that might result to private antitrust defendants who were forced or compelled to comply with state regulatory standards that were inconsistent with the federal antitrust laws, noting that:

"there may be cases in which the State's participation in [an anticompetitive] decision is so dominant that it would be unfair to hold a private party responsible for his conduct implementing it . . ."

*Cantor, supra,* 428 U.S. at 594–95, 96 S.Ct. at 3119. Even apart from the unfairness question, the plurality of the Court recognized tacitly that in some rare instances Congress might not have intended the antitrust laws to apply to areas of the economy primarily and pervasively regulated by the states.

The precise scope of the state action exemption has been somewhat obfuscated by the numerous opinions in *Cantor.* Justice Stewart, in his dissenting opinion, posits an absolute rule that whenever a state regulatory agency approves a proposal and orders a regulated company to comply with it, the state would confer antitrust immunity on private individuals who thereafter follow a state tariff or state law. 428 U.S. at 624, 96 S.Ct. at 3133. By negative implication from the dissent, it is evident that a majority of the Court would conclude that the mere approval of a state regulatory body does not without more immunize conduct from antitrust liability. Because of the differing opinions expressed by the justices, the precedential authority of the *Cantor* decision is certainly unclear. *Cf. Wiesenfeld v. Secretary of Health, Education & Welfare,* 367 F.Supp. 981 (D.N.J.1973) *aff'd* 420 U.S. 636, 95 S.Ct. 1225, 43 L.Ed.2d 514 (1975).

This court believes that the most commonsense approach to the immunity concept embodied by the state action doctrine, the question of unfairness, or potential irreconcilable conflicts between state regulatory schemes and the federal antitrust laws, is one that has been suggested by one commentator, that is, that the state action exemption or a similar immunity concept will be satisfied by a "requirement that the state's regulatory interest be evidenced by active supervision and a clear statement of intent to regulate" the type of activity that has been challenged. 81 Harv. L.Rev. 1, 229–47 (1976). This construction of the exemption appears to be in accord

with numerous decisions in this circuit which employ a penetrating analysis not only of any enabling statutes, but also of the scope of the regulation actually performed by the state agency and the factors taken into consideration during such regulatory proceedings. *E. g., City of Lafayette, Louisiana v. Louisiana Power and Light Co.,* 532 F.2d 431 (5th Cir. 1976); *cert. granted* 430 U.S. 944, 97 S.Ct. 1577, 51 L.Ed.2d 791 (1977); *Jeffrey v. Southwestern Bell,* 518 F.2d 1129 (5th Cir. 1975); *see also, e. g., Litton Systems, Inc. v. Southwestern Bell,* 539 F.2d 418 (5th Cir. 1976); *Gas Light Co. of Columbus v. Georgia Power Co.,* 440 F.2d 1135, 1140 (5th Cir. 1971);[5] *Duke & Company, Inc. v. Foerster,* 521 F.2d 1277, 1280 (3rd Cir. 1975); *Marnell v. United Parcel Service of America, Inc.,* 260 F.Supp. 391 (N.D.Cal.1966); *Mobilfone of Northeastern Pennsylvania v. Commonwealth Telephone Co.,* 428 F.Supp. 131 (E.D. Pa.1977). In other words, mere general supervision by the state is insufficient to constitute the basis for an implied exemption. The Third Circuit prior to *Cantor* held that the unanimous decision in *Goldfarb* compels a holding that:

" . . . absent state authorization which demonstrated that it is the intent of the state to restrain competition in a given area, *Parker*-type immunity or exemption may not be extended to anticompetitive government activities. Such an intent may be demonstrated by explicit language in state statutes, or may be inferred from the nature of the powers and duties given to a particular government entity."

---

**5.** In *Gas Light Co. of Columbus v. Georgia Power Co., supra,* 440 F.2d at 1140, the Fifth Circuit explained the applicability of *Parker* immunity in the context of a regulated public utility, stating:

"the *Parker* exclusion applies to the rates and practices of public utilities enjoying monopoly status under state policy when their rates and practices are subjected to meaningful regulation and supervision by the state to the end that *they are the result of the considered judgment of the state regulatory authority . . . .*" (emphasis supplied).

In the *Gas Light Co. of Columbus* decision, the Fifth Circuit held that since the regulatory decision was made after notice and the conduct of adversary proceedings, the *Parker* immunity was available since the administrative action was the "product" of the state commission. *Id.* Although the Fifth Circuit has recently cast some aspersions on the correctness of the underscored language in dicta in *Litton Systems, Inc. v. Southwestern Bell Telephone Co.,* 539 F.2d 418, 422 (5th Cir. 1976), intense involvement by the state agency in prescribing the ultimate rate to be charged retains its viability as a consideration and standard apropos to the availability of the unfairness doctrine recognized in *Cantor, supra,* 428 U.S. at 595, 96 S.Ct. at 3119.

*Duke & Co., Inc. v. Foerster, supra,* 521 F.2d at 1280. *Accord, City of Lafayette, La. v. Louisiana Power & Light Co., supra,* 532 F.2d at 434; *Brenner v. State Board of Motor Vehicle Manufacturer, Dealers & Salesmen,* 413 F.Supp. 639, 646 (E.D.Pa. 1976); *Mobilfone et al. v. Commonwealth Telephone Co., supra,* 428 F.Supp. at 133.

█ In applying these basic precepts in the instant case, it is evident that in making the threshold inquiry under *Parker* as to whether the activity was compelled by the state in its sovereign capacity, the Government's assertion that the state action prerequisite can only be met by express statutory mandate is incorrect. On the contrary, the state compulsion requirement "[may be satisfied] if the challenged activity was clearly within the legislative intent." *City of Lafayette, Louisiana v. Louisiana Power*

*and Light Co., supra,* 532 F.2d at 434; *Duke & Co., Inc. v. Foerster, supra.*

As defendants correctly note, many of the statutes and rules of the various state regulatory commissions *sub judice* at least implicitly recognize, mandate, or contemplate collective action to a varying degree on the part of intrastate carriers to establish joint and consistent through rates in order to promote the effective provision of transportation services within the respective states by means of establishment of a coherent rate schedule. *See, e. g.,* 1958 Code of Ala., Tit. 48, §§ 301(5), 301(17); Ga. Code Ann. § 68–613, Rules 2, 10(a), General Motor Carrier Rules and Regulations of the Georgia Public Service Commission; Tenn. Code §§ 65–501, 65–1520; Rule .40, Chapter 1220–2–1 of the Rules of the Tennessee Public Service Commission.[6] Indeed, at

---

6. *Alabama*—Under Alabama law, all non-exempted motor carriers are subject "to control, supervision and regulation by the [Alabama public service] commission." Title 48, Ala. Code § 301(3). That authority includes regulation of interstate commerce "except insofar as the same may be in conflict with the provisions of the Constitution of the United States and the acts of congress" in force in 1940 or thereafter enacted. Title 48, Ala. Code § 301(4). The powers and duties of the Alabama public service commission are set forth in Title 48, Ala. Code § 301(5), and include, inter alia:

1. [The duty] [t]o regulate common carriers by motor vehicle as provided in this article and to that end the commission may establish reasonable rules and requirements with respect to adequate service, transportation of passengers, baggage, freight and express, . . .

. . . . . .

4. To supervise and regulate common carriers in all matters affecting the relationship between such common carriers and the traveling and shipping public. . . ."
Title 48, Ala. Code § 301(17), Alabama statute, further places concomitant duties on the common carriers with respect to rates, fares, and charges, including *inter alia:*

". . . B. . . . the duty of every common carrier of property by motor vehicle to provide safe and adequate service, equipment and facilities for the intrastate transportation of property in the State of Alabama; to establish, observe and enforce just and reasonable rates, charges and classifications, and just and reasonable regulations and practices relating thereto . . . [for] all . . . matters relating to or connected

with the intrastate transportation of property in the State of Alabama.
C. Common carriers of property by motor vehicle may establish reasonable through rates and joint rates, charges and classifications with other such carriers or with common carriers by railroad or express or water; . . . In case of such joint rates, fares or charges, it shall be the duty of the carrier parties thereto to establish just and reasonable regulations and practices in connection therewith and just, reasonable and equitable divisions thereof between carriers participating therein, which shall not unduly prefer or prejudice any of said participating carriers. The foregoing provisions demonstrate—at least with respect to provision of through routes—that cooperation between carriers in setting joint and nondiscriminatory rates is encouraged or even implicitly approved by the State.
*Georgia*—Georgia law similarly sanctions cooperation between motor carriers in establishing through routes at prescribed joint rates. To illustrate, the statutory framework requires that the Georgia Public Service Commission "shall prescribe just and reasonable rates, fares, and charges for transportation by motor common carriers of passengers, baggage and property, and for all services rendered by motor common carriers in connection therewith, and the tariffs therefor shall be in such form, and shall be filed and published in such manner and on such notice as the Commission may prescribe, and shall be subject to change on such notice and in such manner as the commission [sic] may prescribe."
Ga. Code Ann. § 68–613.
Under Rule 2, General Motor Carrier Rules and Regulations of the Georgia Public Service Commission, Class A carriers are defined as:

least North Carolina specifically authorizes the use of rate conferences for establishing a stable and coherent rate structure and provides an express exemption from state antitrust liability for agreements of rate

> Common carriers of passengers and/or property operating over a fixed route or between fixed termini in intrastate and interstate commerce, under Certificates of Public Convenience and Necessity.

Rule 10(a) of the Rules and Regulations further provides that

> "Motor carriers of property operating under certificates Class 'A' will be required to receive property destined to stations located on routes of other Class 'A' carriers, *and to interchange such property at rates prescribed by this Commission, with such connecting carriers.*" (emphasis supplied).

Again, as a result of the foregoing rules and regulations, defendants note that the establishment of reasonable through rates at prescribed joint rates *cannot* be effectuated without joint and cooperative action by the carriers, and that ongoing administration of that requirement by the Georgia Public Service Commission mandates action by the Commission which transcends mere general supervisory functions.

*Mississippi*—Under Mississippi law, any carrier wishing to publish and apply rates different from those prescribed by the Mississippi regulatory body must apply to the Commission for authority to make such a change. Thus, defendants contend that the net effect of the pervasive regulatory scheme is to require that all carriers conform to a uniform rate structure, which compels cooperation and joint action except in limited circumstances where prior approval of the Commission is required to be secured. Moreover, defendants have asserted not wholly without justification that the only manner by which carriers could initiate a change in joint-line rates would be by collective application.

*Tennessee*—Under Tennessee law, .the Tennessee Public Service Commission fixes the rates which motor carriers may charge. Although any carrier is permitted to reduce its rates without prior authorization of the Commission, no general increase is permitted until hearings have been held and the approval of the Commission secured. Significantly, Rule .40 of Chapter 1220–2–1 of the Tennessee Public Service Commission, Division of Motor Carriers, adopts Section 5a of the Interstate Commerce Act, 49 U.S.C. § 5b, and provides:

> The rules and regulations governing the agreements between or among two or more carriers relating to rates, fares, classifications, division, allowances or charges (including charges between carriers and compensation paid or received for the use of facilities or equipment), or rules and regulations pertaining thereto, *or procedures for the joint consideration, initiation, or establishment*

conferences approved by the state regulatory commission, that parallels the provisions governing 5a agreements approved by the Interstate Commerce Commission.[7] Chapter 219, Session Laws of North Caroli-

> *thereof* as set forth by the Interstate Commerce Commission in Section 5a of the Interstate Commerce Act, are hereby adopted by the Tennessee Public Service Commission; providing, however, that the final determination on any rates, fares, classifications, divisions, allowances, charges, rules and regulations or procedures shall be left in its final determination to the Tennessee Public Service Commission.

(emphasis supplied).

The Government concedes that the foregoing rule might be construed as authorizing collective rate-making pursuant to the procedures employed by the ICC under § 5a; however, it contends that the "state action" test could still not be satisfied since the "enabling statute of the Tennessee Commission does not authorize such a rule." The Government's argument in this respect, however, fails to recognize that the most recent decision in this circuit, *City of Lafayette v. Louisiana Power & Light Co., supra,* holds that legislative intent and mandate of anticompetitive activities need not be express in such enabling legislation, if the intent can be inferred from the regulatory scheme as a whole. Since the Tennessee Public Service Commission has the function of primary arbiter of the legislative intent in enacting and enforcing the regulatory provisions governing intrastate motor carrier transportation within Tennessee, the Public Service Commission's interpretation and enactment of the foregoing rule has great persuasive import in the absence of express legislation on the subject of collective action by motor carriers and antitrust immunity.

7. House Bill 417 of the North Carolina Legislature, entitled "An Act to provide for Uniform and Joint Rates Among Motor Carriers of the Same Class" contains provisions similar to those in the federal Motor Carrier Act. The Bill, which was enacted by the state legislature, allows two or more carriers to enter into an agreement relating to "rates, fares, classifications, divisions, allowances or charges" "[f]or the purpose of achieving a stable rate structure." Subsection (b) further provides that it "shall be the policy of [the State of North Carolina] to fix uniform rates for the same or similar services by carriers of the same class." Similarly, like § 5a of the Motor Carrier Act, the parties to the agreement may apply to the state public service commission for approval of the agreement. Moreover, pursuant to § (h), the parties to any agreement so approved are relieved from the operation of the *state* antitrust laws with respect to the making of the

na, 1977, G.S. 62–52.1. *See also,* Rule .40, Chapter 1220–2–1 of the Rules of the Tennessee Public Service Commission. *See* note 6, *supra.*

█ Of course, mere state authorization of collective rate-fixing practices may not be equated with state compulsion of the otherwise prohibited activities for the purpose of Sherman Act immunity under *Parker v. Brown.* Thus, as the Government aptly observes, while carriers may be encouraged to establish a coherent rate system which might entail cooperation by the carriers, particularly in establishing joint through-rates by non-competing carriers, the statutes, regulations, and rules cited by defendants do not expressly command nor require such motor carriers to join with each other in the collective proposal, albeit establishment, of intrastate rates, where such conduct, but for state involvement, would constitute a *per se* violation of § 1 of the Sherman Act. Furthermore, under some of the state's regulatory frameworks, some of the rates "proposed" in a tariff will become automatically applicable if no objections are filed or if the regulatory commissions do not conduct an investigation or hearings, with the result that some rates may go into effect without any apparent consideration of their reasonableness or anticompetitive effects, and without any state administrative imprimatur being placed upon the proposed tariffs. *Compare Gas Light Company of Columbus v. Georgia Power Co., supra,* 440 F.2d at 1140. *See* note 5, *supra* and accompanying text.

However, it is equally true that collective action such as that participated in by defendants may be implicitly compelled by the nature of the regulatory scheme as a whole and a *necessary consequence of the obliga-*

tions imposed on the individual carriers in order to make state regulation of intrastate motor carrier operations effective. *See City of Lafayette v. Louisiana Power & Light Co., supra. Cf. Gordon v. New York Stock Exchange, Inc., supra; United States v. National Association of Securities Dealers, Inc., supra. Cf. Opinion of the Attorney General of North Dakota,* 1976 Trade Cases ¶ 60,856 (Mar. 5, 1976).

The instant action presents questions much closer than those considered by the Supreme Court in either *Goldfarb* or *Cantor.* Thus, in *Goldfarb* the mere fact that the legislature had authorized the Supreme Court to generally regulate and supervise the practice of law did not constitute the requisite state compulsion since a county bar association had actually fixed the minimum legal fees. In dicta, however, the Court suggested that had Virginia Court itself imposed the minimum fee schedule, the alleged antitrust violations would have been exempted by reason of state action. But only if the state court's rules fell within the intended scope of its legislative authorization to "regulate the practice of law." *Goldfarb, supra,* 421 U.S. at 788, 95 S.Ct. 2004. *City of Lafayette v. Louisiana Power & Light Co., supra,* 532 F.2d at 434 n. 8.

*Cantor,* on the other hand, arose in a factual context more analogous to that *sub judice,* since the conduct attacked in *Cantor* was the enforcement of a tariff that had been approved by the Michigan Public Service Commission. The conduct challenged in *Cantor* was the tie-in of the sale of light bulbs to the sale of electrical services, the latter of which was, of course, a natural monopoly. The plurality concluded that the tying arrangement was not immunized by

agreement and in carrying out the agreement according to the terms and conditions thereof and those imposed by the state public service commission. The North Carolina provisions are virtually identical to the parallel provisions of the Motor Carrier Act and, indeed, constitute demonstrable and persuasive evidence that motor carriers, at least within the State of North Carolina, may be subject to conflicting standards imposed by the state regulatory commis-

sion and the broader standard of competition imposed by the federal antitrust laws. Our observations in this respect, of course, do not constitute recognition of any absolute principle that the state could expressly immunize a carrier's activities from the federal antitrust laws, since such a holding would be contrary to the Supremacy and Commerce clauses of the Constitution. *See Marnell, supra. See also, Cantor, supra,* 428 U.S. at 596, 96 S.Ct. at 3120.

reason of the approval of the tariff filed by the utility noting that any arguable implied exemption from antitrust liability must be predicated upon a finding that the exemption was necessary in order to make the regulatory scheme work. 428 U.S. at 579, 96 S.Ct. at 3110–11. In this connection, the Court noted that even assuming that Congress did not intend the antitrust laws to apply to areas of the economy primarily and traditionally regulated by the states, such as the provision of electrical services, that assumption would not foreclose the enforcement of the antitrust laws in an essentially *unregulated* area of the economy such as the market for electric light bulbs. *Id.*, 428 U.S. at 595, 96 S.Ct. at 3119. Concomitant-

ly, the Court recognized that not all economic regulation assumed by the state was designed to avoid the consequences of unrestrained competition, such as the agricultural marketing program involved in *Parker*, but that some regulation including that of the natural monopoly involved in *Cantor* was necessary and designed to protect the consumer from monopolistic exploitation. *Id.*, 317 U.S. at 366, 389, 63 S.Ct. 307 (1973) (Stewart, J., dissenting).

Unlike *Cantor*,[8] however, the instant case involves a state regulatory agency's approval of rate tariffs, which presumably lie within the domain of state regulatory power and which presumably, it was the intent of the state legislature to regulate.[9] Any

**8.** *Cf. Mazzola v. Southern New England Telephone Co.*, 1975–2 Trade Cases ¶ 60,439 (Conn. Sup.Ct.1975) discussed *infra* at note 9.

**9.** The Attorney General for the State of North Dakota has recently expressed his opinion that the constitutional prohibitions on combinations and monopolies for the purpose or having the effect of controlling the price of transportation under North Dakota law was not applicable to the rate-making function of a rate-bureau such as defendants herein. *Opinion of the Attorney General of North Dakota.* 1976–1 Trade Cases ¶ 60,856 at 68755 (1976). The Attorney General relied on several factors in reaching that conclusion. In the first instance, he observed that the comprehensive state regulation carried on by the state through its Public Service Commission and that the ultimate control over tariffs, rates, charges, rules and regulations and practices of the carrier rested ultimately with the state. He further found it significant that the Public Service Commission had, like North Carolina herein, exempted a rate bureau from the proscriptions of the state antitrust laws. In analogizing the state provisions with those contained in § 5a of the Motor Carriers Act, he concluded that:

> when actions of common carriers are subject to complete and minute regulation in the public interest by the ICC and PSC there is no need to apply antitrust laws to reinforce competition . . . since public regulation such as we have here is generally considered to be a substitute for free market forces and anti-trust legislation which has in the past proven its inability to preserve competition. *Id.* at 68,755.

The Attorney General further relied upon a recent order and report of the ICC in Ex Parte No. 297, Rate Bureau Investigation, decided June 3, 1975, in which the ICC concluded that review of operations which was also participated in by the Anti-Trust Division of the Unit-

ed States Department of Justice, of rate bureaus had not disclosed any significant abuses of the procedures utilized by such bureaus; therefore, the report concluded that the antitrust immunity conferred by § 5a should be continued. Secondly, the Attorney General found it significant that each carrier member of a rate bureau retained its full right of independent action, and that joint rate-making done by such rate conferences was "necessary to ensure the uniform and non-discriminatory rates mandated by the [North Dakota] legislature." Accordingly, the Attorney General concluded that a "rate bureau's publication of tariffs governing the charges for intrastate transportation of property within North Dakota is infused with sufficient state action to exempt it from the proscriptions of" North Dakota's antitrust laws. Significantly, the Attorney General also noted that a rate bureau's publication of tariffs governing transportation of property could be distinguished from factual situations involving the tie-in of a service, such as the sale of electrical bulbs, which was not immunized from antitrust attack under the federal antitrust laws, see *Cantor, supra,* or tie-ins of nonnecessary devices for telephone answering devices, which were not immunized from attack under Connecticut's antitrust laws. *Mazzola v. Southern New England Telephone Co.,* 1975–2 Trade Cases, ¶ 60,439 (Conn.Sup.Ct.1975). But see *South-West Utilities, Inc. v. South Central Bell Telephone,* 1977 Trade Cases, ¶ 61,303 (La. Ct.Apps.1976) (Louisiana Public Service Commission has no authority nor could it be implied from power to regulate "reasonableness" of rates to shield a regulated industry from antitrust scrutiny under state law since rates and services which are "reasonable and just" may be part of an overall conspiracy to restrain trade.)

informed determination as to whether it was the further intent of the legislature or implicit within the legislative grant of authority that such regulation was intended or designed to ameliorate against the effect of unrestrained competition or whether the respective state agencies consider such anticompetitive effects in the approval of such tariffs and proposals cannot in the instant case be made on the allegations of the complaint and answers, since it is well settled that motions to strike are not designed to test the evidentiary sufficiency of the allegations in the complaint. *See Croy v. Skinner, supra; Augustus v. Public Board of Education, supra.* Likewise, unlike *Cantor,* on the basis of the allegations in the complaint and the answers, we are unable to summarily conclude that this may not be a case "in which the State's participation in a decision is so dominant that it would be unfair to hold a private party responsible for his conduct in implementing it." *See Cantor, supra,* 428 U.S. at 594, 96 S.Ct. at 3119.

■ Accordingly, for the reasons hereinabove expressed, the Government's motions to strike the *Parker v. Brown* defense, the State Action defense, and the Unfairness Doctrine defense is hereby DENIED.

## NOERR–PENNINGTON DOCTRINE AND THE FIRST AMENDMENT

■ The *Noerr-Pennington* Doctrine defenses and defendant NCMCR's related defense bottomed on the First Amendment to the United States Constitution are somewhat related to the state action exemption. The *Noerr-Pennington* doctrine is predicated upon two Supreme Court cases, *Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc.,* 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961) and *United Mine Workers v. Pennington,* 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965). In *Noerr,* the Court held that the Sherman Act does not forbid association for the purpose of influencing the passage of anticompetitive legislation and recognized the significant First Amendment interests of association, assembly, and free speech implicated by the

case. Similarly, *Pennington* held that a union and several large coal producers were not liable under the antitrust laws for successful lobbying which resulted in the Secretary of Labor's taking action adverse to small coal companies, and for the defendants' compliance with the resulting legislation. Thus, in *Pennington,* the Supreme Court observed:

Joint efforts to influence public officials do not violate the antitrust laws even though intended to eliminate competition. Such conduct is not illegal, either standing alone or as part of a broader scheme itself violative of the Sherman Act.

381 U.S. at 670, 85 S.Ct. at 1593.

Moreover, it is now well settled that the *Noerr* doctrine applies equally to lobbying efforts before administrative agencies and courts at both the state and federal level. *See California Motor Transport Co. v. Trucking Unlimited,* 404 U.S. 508, 510–11, 92 S.Ct. 609, 30 L.Ed.2d 642 (1972). *See generally Annot.,* 17 A.L.R.Fed. 645, 658 (1973) (and cases cited therein). In sum, it is clear that the Sherman Act does not prohibit two or more persons from associating together in an attempt to persuade the legislature, the executive, or administrative agencies to take particular action which would produce a restraint or monopoly. In *Noerr,* however, the Supreme Court in dicta admonished that: "[T]here may be situations in which a publicity campaign ostensibly directed toward influencing governmental action is a mere sham to cover what is actually nothing more than an attempt to interfere directly with the business relationships of a competitor and the application of the Sherman Act would be justified." 365 U.S. at 144, 81 S.Ct. at 533. In *California Motor Transport Co. v. Trucking Unlimited, supra,* the Supreme Court added dimension to the "sham" exception holding that concerted litigation and appeals from agency decisions designed to deter competitors from seeking new operating rights were not within the umbrella of the *Noerr-Pennington* protection, since such activities were not merely the exercise of defendant's right to petition, but were in reality efforts to

deny their competitor's equal right to free and unimpaired right to access to the courts and administrative tribunals. In sum, by denying their competitors access to such tribunals, defendants had usurped the decision-making process and made them the real "'regulators of the grants of rights, transfers, and registrations'" to plaintiffs. 404 U.S. at 511, 92 S.Ct. [609] at 612.

Defendants herein contend that their submission of rate proposals and tariffs to the state agencies is protected by *Noerr* since such activities are merely aimed at influencing state administrators to approve such tariffs. Similarly, defendant NCMCA further argues that such conduct is nothing more than the exercise of its right to petition and its right of free access to adjudicatory and regulatory tribunals, to secure favorable action on their rate proposals. The Government, on the other hand, observes that the complaint charges the defendants with three distinct types of activity, including: (1) coordination and fixing of rates; (2) presentation of their collectively set rates to state public service commissions for the commissions' approval as reasonable; and (3) putting the collectively fixed rates into effect, ostensibly pursuant to state sanction. The Government implicitly concedes that submission of the tariff proposals to the agency arguably is exempted activity under *Noerr-Pennington* immunity; however, it does assert that *Noerr-Pennington* does not, however, grant a blanket immunity from defendants' non-exempt conduct, including the collective rate-fixing and the implementation and enforcement of the collectively set rates.

While we are compelled to agree with the Government's logic in this respect, we can see no purpose in filing its motion to strike the *Noerr-Pennington* and First Amendment defenses since those defenses are presumptively valid and available with respect to the second type of conduct challenged by the complaint, unless, on the basis of facts not of record, the Government can demonstrate that defendants' efforts were a mere "sham" whereby defendants usurped the powers of the state regulatory agency and excluded non-member carriers from submission of competitive rates. In this connection, we further note that irrespective of the exemption afforded defendants from antitrust liability for the mere activity of seeking approval of such collectively set rates, defendants may nevertheless be liable for non-exempt activities. Thus, this court may consider all of defendants' arguably exempt activities associated with the petitioning process which are relevant and admissible as purpose and character evidence to prove the anticompetitive intent of defendants' nonexempt conduct as well as the overall anticompetitive scheme. *E. G., Pennington, supra*, 381 U.S. 670–71 n. 3, 85 S.Ct. 1585; *Household Goods Carriers' Bureau v. Terrell*, 5 Cir., 417 F.2d 47, 52, *adhered to in part*, 452 F.2d 152, 158 (5th Cir. 1971) (en banc).

Accordingly, for the reasons hereinabove expressed, the Government's motion to strike the *Noerr-Pennington* and First Amendment defenses is hereby DENIED.

## PRIMARY JURISDICTION AND EXHAUSTION OF STATE REMEDIES

The Government has moved to strike the ninth and tenth defenses raised by SMCRC relating to primary jurisdiction and the Government's failure to exhaust administrative and/or state remedies. The Government's motion to strike is bottomed upon its contention that the Interstate Commerce Commission has no jurisdiction over the collective action of carriers in the initiation, proposal, and approval of intrastate rates, which arguably have a substantial effect upon interstate commerce, and relies upon the opinion of this court in *In re Grand Jury Subpoena Duces Tecum Issued to SMCRC*, 405 F.Supp. 1192 (N.D.Ga.1975); *United States v. Morgan Drive Away*, 1974 Trade Cases ¶ 74,888 (D.D.C.1974).

In opposition to the motion, defendant SMCRC contends, however, that "the ultimate effect of the [Government's] effort [to impose liability on defendants in the intrastate rate-making field for what is condoned and sanctioned in the context of interstate rate-making] is not known and can-

not be known by [the] court in the absence of an advisory finding by each regulatory agency directly or indirectly involved." Accordingly, this defendant requests that the matter be referred to the ICC and the regulatory agencies in each of the five states for "an advisory" ruling.

■ In *In re Subpoena Duces Tecum, supra,* we expressly considered the question of whether the doctrine of primary jurisdiction required prior resort to the Commission to determine whether the inclusion of intrastate rates in defendants' § 5a agreement approved by the ICC would be immune from antitrust liability because of inclusion therein and ICC approval. After reviewing the basic tenets of the primary jurisdiction doctrine, we concluded that the issue involved was purely legal, i. e., the question of the ICC's jurisdiction, and that the doctrine of primary jurisdiction was inapplicable because the situation called for no factual determination, which must be based on the agency's special expertise or experience. *Id.,* 405 F.Supp. at 1196. Moreover, our earlier holding is consistent with the general proposition that once the Commission has authoritatively ruled that it has no regulatory power over a certain practice, such as intrastate motor carrier rates, *see Motor Transportation of Property,* 9 MCC 541 (1964), a federal court may grant any appropriate relief including an injunction without thereby encroaching on the Commission's regulatory authority or its primary jurisdiction. *Seatrain Lines v. Pennsylvania R. Co.,* 207 F.2d 255 (3d Cir. 1953). In other words, at least with respect to the request that this court refer the action primarily to the Commission, it is evident that not only does the ICC not have primary jurisdiction, it simply has no jurisdiction to consider intrastate rates, approve such rates, or confer any immunity from antitrust law thereon. *See, e. g., In re Subpoena Duces Tecum, supra; Marnell v. United Parcel Service of America, Inc., supra,* 260 F.Supp. at 411; *United States v. Morgan Drive Away, Inc.,* 1974 Trade Cases ¶ 74,888 (D.D.C.1974). In conclusion, then, there exists no potentiality of conflict between this court and the power of the Com-

mission to administer the Interstate Commerce Act with uniformity and consistency, to warrant application of the doctrine of primary jurisdiction.

A more difficult question raised by defendant SMCRC, however, is whether prior resort or reference of some or all of the issues of this case should be made to the state public service commissions that enforce the state regulatory acts, or whether the Government arguably must exhaust any claims or remedies which it may have before these agencies before seeking injunctive relief in federal court.

■ The doctrine of primary jurisdiction is intended to apply principally in cases in which the court has jurisdiction to grant the particular relief granted upon satisfactory proof of the facts alleged, but the issues raised are such as are not within the conventional experience of judges and fall within the peculiar expertise of competency of administrative agency where uniformity of statutory policy or interpretation is desirable. *E. g., Far East Conference v. United States,* 342 U.S. 570, 72 S.Ct. 492, 96 L.Ed. 576 (1952); *United States v. Western Pacific Railroad Co.,* 352 U.S. 570 (1952); *United States v. Western Pacific Railroad Co.,* 352 U.S. 59, 77 S.Ct. 161, 1 L.Ed.2d 126 (1956); *Ricci v. Chicago Mercantile Exchange,* 409 U.S. 289, 93 S.Ct. 573, 34 L.Ed.2d 525 (1973) [hereinafter *"Ricci"*]. Application of the doctrine of primary jurisdiction, therefore, frequently arises "when conduct seemingly within the reach of the antitrust laws is also at least arguably protected or prohibited by another regulatory statute enacted by Congress," *Ricci, supra,* 409 U.S. at 299–300, 93 S.Ct. at 579, because the regulatory statute grants the relevant agency authority to enforce the statute's distinct standards, which may or may not include considerations of free and unrestrained competition at the heart of the federal antitrust laws. *Id.* at 300, 93 S.Ct. 573.

At the outset, this court is compelled to note that the question of whether precepts of primary jurisdiction compel resort to

state regulatory agencies as opposed to federal regulatory agencies is subject to considerable doubt, since *Ricci* defines the problem as involving private conduct "within the reach of the antitrust laws [which is also] at least arguably protected . . . by another regulatory statute *enacted by Congress.*" *Id.* (emphasis supplied). Therefore, there is some authority suggesting that the doctrine of primary jurisdiction is only a means of accommodating the sometimes conflicting goals of the same sovereign. *See, e. g.,* Jaffee, *Primary Jurisdiction Considered—The Antitrust Laws* 102 U.Pa.L.Rev. 577, 581 (1974); Convisser, *Primary Jurisdiction: The Rule and its Rationalizations,* 65 Yale L.J. 315, 336–37 (1956); *Litton Systems, Inc. v. Southwestern Bell Telephone Co.,* 539 F.2d 418, 421 (5th Cir. 1976). *But see Industrial Communications Systems, Inc. v. Pacific Telephone and Telegraph Co.,* 505 F.2d 152, 157 (9th Cir. 1974). However, even assuming arguendo that the doctrine of primary jurisdiction may be invoked to afford a state agency, an opportunity for prior action or interpretation, the only instance cited by defendant SMCRC in which such a rule has been applied has been where the identical issue involved in the federal litigation was already pending in proceedings involving the same parties before the state agency. *See Industrial Communications System, Inc. v. Pacific Telephone & Telegraph Co.,* 505 F.2d 152, 157 (9th Cir. 1974). That is the most traditional case warranting application of the doctrine of primary jurisdiction, *e. g., Louisiana Power & Light Co. v. Federal Power Commission,* 526 F.2d 898, 910 (5th Cir. 1976); *MCI Communications Corp. v. American Telephone & Telegraph Co.,* 496 F.2d 214, 223–24 (3rd Cir. 1974), although arguably it would serve little purpose herein since the public service commissions have already placed their administrative imprimatur and approval on defendants' tariffs.

Since the precise scope of the doctrine of primary jurisdiction is not altogether clear, however, we will turn to the factors mentioned in *Ricci* which support prior reference to regulatory agencies. *Ricci* was an action brought by a former member of the Chicago Mercantile Exchange against the Exchange and others for conspiring to restrain his business by transferring his membership in the Exchange without notice and a hearing. The practices were alleged to have been violative of the Exchange rules, the Commodity Exchange Act, and the federal antitrust laws. The Supreme Court held that it was proper to stay the action pending prior reference to the Commodity Exchange Commission, premising its decision to stay upon three reasons: (1) that it would be essential for the antitrust court to determine whether the Commodity Exchange Act or any of its provisions were "incompatible" with the maintenance of an antitrust action; (2) that the Commodity Exchange Commission had statutory jurisdiction to consider and resolve some facets of the dispute between Ricci and the Exchange; and (3) the adjudication of the dispute by the Commission "promises to be a material aid in resolving the immunity question." *Id.,* 409 U.S. at 302, 93 S.Ct. at 580. The Government in support of its motion to strike has relied upon the most recent decision in this circuit construing the applicability of the doctrine of primary jurisdiction, *Litton Industries v. Southwestern Bell Telephone Co., supra* which it argues requires this court to summarily strike the defenses *sub judice.*

In *Litton Industries, supra,* the Fifth Circuit reversed an order of the district court staying proceedings, pending prior reference to state regulatory commissions that had approved the tariffs challenged in the private antitrust suit. The court observed, in the first instance, that it was apparent "that the challenged tariffs [involving a tying of branch exchange telephone equipment together with the normal provision of telephone service] were first, the result of the utility's initiative, and, second, routinely acquiesced in by each regulatory board." 539 F.2d at 423. The Fifth Circuit found the facts extraordinarily close to the situation in *Cantor,* in which no argument had been made that prior reference to the state utility commission would serve any desirable objective. In applying *Cantor,* the Fifth Circuit noted that the Supreme Court had recognized two rationales for exempt-

ing private conduct from the Sherman Act, that is, the unfairness to a private party if such conduct were required by the state and "the supposed intention of the Sherman Act itself to be inapplicable to inconsistently regulated areas of the economy." Like the Court in *Cantor*, the Fifth Circuit in *Litton Industries*, found that it was "obvious" that the tying arrangements in both cases had not been coerced by the regulatory agency, and, therefore, the utility could not assert that any Sherman Act liability predicated upon the tying arrangement would be in-

herently unfair. Moreover, the Fifth Circuit concluded that the district court could have adequately determined from the record and the regulatory scheme that the challenged tying arrangement involving branch exchange equipment was unnecessary to the states' ability to regulate effectively the provision of telephone services. 539 F.2d at 424.[10] *See also Cantor, supra*, 428 U.S. at 598, 96 S.Ct. at 3121.

■ In contrast, in the instant action the collective rate-making activities at-

10. The Government has rather effectively argued that it has no standing to challenge the anticompetitive effects of the rate-making procedures nor are there any administrative procedures available to it under the laws of the individual states, with the result that doctrines of primary jurisdiction or exhaustion of remedies are wholly inapposite. We are compelled to observe that defendant SMCRC has not specifically pointed out any express remedies that the Government might have. Likewise, insofar as the doctrine of primary jurisdiction is concerned, we find the instant facts barely distinguishable from *Litton Systems, Inc., supra*, where this circuit observed in an analogous context:

> None of Bell's other arguments in favor of the district court's [prior reference in] this case are persuasive. First, Bell asserts that the state tribunals should have the opportunity to determine the "validity" of Bell's tariffs. This determination has already been made, however; the tariffs were assented to by the State and local tribunals as "just and reasonable" within the meaning of State and local law.

539 F.2d at 424 n. 16.

To the extent that defendants might seek prior resort for a determination as to the "validity" of the subject tariffs and rates, we would be compelled to agree with the Government, that the defendants' rates have either been approved or acquiesced in by the respective state public service commissions on the basis of the *Litton Systems, Inc.* decision.

On the other hand, insofar as defendant SMCRC seeks resort to the state tribunals on the question of whether such collective rate-making activities were a "regulatory necessity", other language in *Litton Systems, Inc.* suggests that prior resort to the respective agencies might not be wholly futile.

Thus, in contrast to the facts herein, the Fifth Circuit in *Litton Systems, Inc.* concluded that the district court could have, as in *Cantor*, adequately determined the immunity question without prior reference to state agencies, noting:

> The manner in which Bell tariffs were acquiesced in by the state agencies strongly suggests that the tying of PBX equipment to general telephone service was not considered necessary to effective regulation of telephone service. No state statute, case, regulation, or ruling has been cited as suggesting even remotely that the acquiescence in the asserted tying arrangements is the product of any coherent state policy. Bell's effort to seek prior recourse at this stage is not designed to clarify the purpose of such policy nor the need for arrangements to effectuate that policy . . . It is arguable that Bell desires to establish a regulatory necessity for its practices after itself inventing and establishing those very practices.

539 F.2d at 424.

The Government has aptly noted that in some instances passive acquiescence by the state commissions has resulted in the defendants' establishment of the practices and rates with respect to which they seek to establish a "regulatory necessity." However, defendants have cited numerous state statutes, regulations, and rules to support their contention that the rates as well as the means to fix such rates are the product or result of coherent state policy. Even assuming that *Cantor* and *Bates v. State Bar of Arizona*, ─── U.S. ───, 97 S.Ct. 2691, 53 L.Ed.2d 810 (1977) collectively stand for the proposition that *Parker* immunity is available only to the state or state agencies, we are not inclined to summarily hold that prior resort may not be desirable on the unfairness question. Such a determination could be more appropriately made following discovery, through a motion filed by defendants seeking a stay of this action pending prior reference after the factual background could be developed.

\* Following this court's decision on the Government's motion to strike the defendants' *Parker* defense, but prior to the filing of the opinion in this action, the Supreme Court shed additional light on the *Parker* immunity question in *Bates v. State Bar of Arizona*, ─── U.S. ───, 97 S.Ct. 2691, 53 L.Ed.2d 810 (1977). *Bates* was a multi-faceted challenge to the Arizona Supreme Court's disciplinary rule that prohibited attorneys from advertising in newspapers and other

tacked and the resulting tariffs are not mere collateral tying-arrangements but appear to be integrally related to and indeed the crux of the various regulatory schemes themselves and the carriers' and the state commissions' duties to provide a coherent and reasonable rate structure for intrastate motor carrier transportation. In light of the various state statutes and regulations cited by the defendants which implicitly authorize or even compel such joint rate-making activities, we are constrained to conclude that the activities attacked as illegal herein are not wholly unnecessary to the states' ability to effectively regulate the rates for motor carrier transportation within the respective states nor are they unnecessary for the individual carriers to perform the obligations imposed on them by the regulatory scheme. *Cf. Op'n of Att'y Gen.*

*of North Dakota, supra.* It is arguable, therefore, that some sort of prior resort or prior reference to the state regulatory agency could more accurately delineate the scope and nature of the instant regulatory schemes and articulate any element of state compulsion of collective rate-making practices. Such prior resort on such threshold issues might materially aid this court in ultimately determining the availability of immunity under *Parker v. Brown, supra,* as well as the unfairness element. Finally, in view of the restricted nature of the appropriate considerations relevant to a motion to strike and the reluctance with which courts approach the adjudication of important legal issues on such procedural motions, *see, e. g., Augustus v. Board of Public Instruction, supra; Moreman v. Georgia Power Co., supra* ; we decline to hold that

media. The Court held that insofar as plaintiffs sought to predicate their claims on § 1 of the Sherman Act, such antitrust claims were barred by *Parker* immunity, "[since] the challenged restraint is the affirmative command of the Arizona Supreme Court under its Rules 27(a) and 29(a) and its Disciplinary Rule 2–10(B)." —— U.S. at ——, 97 S.Ct. at 2697. Because the Arizona Supreme Court was "the ultimate body wielding the State's power over the practice of law (citations omitted) . . . the restraint is 'compelled by direction of the State acting as a sovereign.' [*Goldfarb, supra* ], 421 U.S., at 791, 95 S.Ct., at 2015."

In *Bates*, the Court distinguished *Cantor* on three essential grounds. In the first instance, it observed that "obviously *Cantor* would have been an entirely different case if the claim had been directed against a public official or public agency, rather than against a private party" since the appellants' claims in *Bates* were in reality against the State and the Arizona Supreme Court and enforcement undertaken by the State Bar was "completely defined" by that court.

Secondly, the Court recognized that the State had "no independent regulatory interest" in the market for light bulbs and there was no intimation that the light bulb program "was justified by flaws in the competitive market or was a response to health or safety programs" or "essential to the State's regulation of electric utilities." *Id.* Third, the Court noted that the challenged activity in *Cantor* was instigated by the utility with the acquiescence of the state regulatory commission, whereas in *Bates* the challenged "disciplinary rules reflect a clear articulation of the State's policy with regard to professional behavior." *Id.* As a corollary to the foregoing comparisons, the court noted its

reluctance to approve "[f]ederal interference [by means of the application of the federal antitrust laws] with a State's traditional regulation of a profession . . . deeming it significant that the state policy is so clearly and affirmatively expressed and that the State's supervision is so active." *Id.*

It would appear that the opinion in *Bates* does not require us to depart from our initial denial of the Government's motion to strike the State Action defense premised on *Parker* immunity. In connection with that conclusion certain observations are relevant for the future course of the instant proceedings. In the first instance, all the justices concurred with respect to the Sherman Act immunity under *Parker v. Brown*, noting that while the claims in *Bates* were ostensibly directed at the State Bar association, the "real party in interest was the State and the Bar association acted merely as the delegated" agent of the [Arizona Supreme Court] under its constant supervision.

While the State's participation in and connection with the defendants' rate-making activities is somewhat more tenuous than the interrelationship in *Bates*, we are unable to conclude that certain of the allegedly offensive practices might not be compelled by direction of the state acting as sovereign. Similarly, *Bates* reaffirms the necessity of the State's regulatory interest and the Court's disinclination to intervene in areas traditionally subject to state regulation, which would include intrastate commerce. Moreover, whether the instant state policies with respect to coherent rate structures are clearly articulated or may be implied and whether the state's supervision is "so active" requires sensitive factual determinations not capable of adjudication at this stage of the proceedings.

defendant SMCRC's defense of primary jurisdiction is wholly frivolous or legally insufficient at this early stage of the proceedings.

Accordingly, for the reasons hereinabove expressed, the Government's motion to strike SMCRC's defense of primary jurisdiction and exhaustion of remedies is hereby DENIED.

### UNCLEAN HANDS DEFENSE

██ SMCRC has further raised the defense of unclean hands as a result of the fact that for thirty years the Government has allegedly permitted and even encouraged the conduct which it now seeks to hold violative of the antitrust laws. The instant defense is patently insufficient since it is well settled that the doctrine of unclean hands is inapplicable as a defense to a suit brought by the Government in its sovereign capacity to enforce the federal antitrust laws. *E. g., United States v. Shubert*, 14 F.R.D. 471, 474 (S.D.N.Y.1953); *United States v. RCA*, 358 U.S. 334, 352, 79 S.Ct. 457, 3 L.Ed.2d 354 (1959). *See also McKesson and Robbins, Inc. v. Pfizer*, 235 F.Supp. 743 (E.D.Pa.1964); *Greene v. General Foods Corp.*, 517 F.2d 635, 647 (5th Cir. 1974). Moreover, defendant SMCRC apparently does not contest this portion of the motion to strike, since it has filed no objection thereto. *See* Local Court Rule 91.2.

Accordingly, for the reasons hereinabove expressed, plaintiff's motion to strike SMCRC's unclean hands defense is hereby GRANTED.

One further matter is deserving of this court's attention. While none of the parties has requested the participation of the various states and/or the regulatory commissions involved in intrastate rate-making activities with respect to the for-hire transportation of general commodities except insofar as defendants have invoked the doctrine of primary jurisdiction, it is evident to this court that the focus of the court in adjudicating the defenses of *Parker v. Brown* and *unfairness* will involve to a great extent not only the question of the express regulatory authority as evidenced by statutory authorization, but also will necessitate penetrating inquiry into the scope and nature of the regulatory powers actually performed and the nature of the power contemplated by such statutory regulatory framework, including any anticompetitive design or intent. To this end, this court deems it desirable to encourage the States implicated in this action to participate in the instant action by filing briefs, memoranda, or evidence which may be a critical aid in the ultimate resolution of the issues presented herein. Accordingly the Attorney General or other chief law enforcement officers of the States of Alabama, Georgia, Mississippi, Tennessee, and North Carolina are hereby INVITED to PARTICIPATE as amicus curiae in the instant action. The Clerk is hereby DIRECTED to mail a copy of the instant order by certified mail return receipt requested to the Attorney General of the States of Alabama, Georgia, Tennessee, Mississippi, and North Carolina.

In sum, this court has today: (1) DENIED defendants' motion to dismiss for lack of subject matter jurisdiction; (2) DENIED defendants' motion to dismiss for failure to state a claim; (3) GRANTED the Government's motion to strike defendant SMCRC's unclean hands defense and DENIED its motion to strike all other defenses; and (4) invited the Attorney Generals of the respective states to participate as amicus curiae.

IT IS SO ORDERED.